(19 App. Div. 471.)

## PIEHL v. ALBANY RAILWAY.

(Supreme Court, Appellate Division, Third Department.  July 6, 1897.)

EXPLOSION Oᴸ FLY WHEEL—ENGINEER—MISTAKE OF JUDGMENT.

    Belts connected the fly wheels of engines in a power house of an electric street-railway company with two generators of electricity. The engines worked in multiple, their products of electricity being blended. When the engineer went on duty, he found everything running smoothly; but shortly afterwards a generator began to spark violently. Unable to ascertain the cause, he promptly went to the ammeters, and discovered a great disparity in amperage of the generators. There were two methods of equalizing the amperages,—one by means of the rheostat, which operates gradually, and the other by breaking the circuit, which operates immediately. Both of these means were at the engineer's hand. He noticed that one of the engines was "running away," and broke the circuit, and immediately went to the throttle of said engine, 24 feet distant, and shut off steam, but a moment later its fly wheel burst. Plaintiff and his experts claimed that the engineer, on observing that the engine was "running away," should have shut off steam first, and then broken the circuit, since to do the latter first, was to lighten the engine's load, and thus increase the speed of its fly wheel. Defendant and its experts claimed that the engineer acted properly, and that he could rely on the automatic governor of the engine to prevent its running beyond the safety limit between the breaking of the circuit and the shutting off of the steam. The governor was evidently out of order. The cause of the explosion was not shown. *Held* insufficient, as a matter of law, to show that the engineer was either incompetent or negligent.

Appeal from trial term, Albany county.

Action by Maggie Piehl, administratrix of the goods, chattels, and effects of John Piehl, Jr., deceased, against the Albany Railway, to recover damages for the death of deceased. From a judgment entered on a verdict for plaintiff, and from an order denying a motion for new trial, made on the minutes, defendant appeals. Reversed.

Argued before PARKER, P. J., and LANDON, PUTNAM, and MERWIN, JJ.

Lewis E. Carr and Edward W. Douglas, for appellant.
Mark Cohn, for respondent.

LANDON, J.  On November 12, 1895, a fly wheel, 20 feet in diameter, weighing 50,000 pounds, forming part of one of the steam engines operated by the defendant in its power house upon the east side of South Pearl street, in the city of Albany, burst, and some of the fragments, flying through the west side of the power house across the street and into a saloon upon the west side of the street, struck and killed John Piehl, the plaintiff's intestate. The plaintiff brought this action under the statute to recover damages, charging that Piehl's death was caused by the negligence of the defendant. Upon the trial the plaintiff sought to prove defects in the defendant's machinery and appliances; also the inadequacy of its force of operatives; but upon the close of the testimony the learned trial court held that the evidence was not sufficient to raise any question in these respects, and that the only evidence raising any question of negligence upon the part of the defendant was in respect to the action and competency of the engineer in charge of the power house at the time of the explosion and immediately preceding it. We are not called

upon to review the ruling of the learned trial judge in thus narrowing the range of the questions submitted to the jury. The plaintiff cannot now sustain the verdict upon the ground taken from him by the trial judge. Wangler v. Swift, 90 N. Y. 38. We must assume that the explosion, in view of this condition of things, did not raise a presumption of negligence upon the part of the defendant. Cosulich v. Oil Co., 122 N. Y. 118, 25 N. E. 259; Reiss v. Steam Co., 128 N. Y. 103, 28 N. E. 24. The burden therefore rested upon the plaintiff to show some act of negligence in the operation of this suitably equipped plant.

The main question for us to consider is whether the evidence touching the action of the engineer under the circumstances disclosed, or his competency, presented a case justifying the submission to the jury of the question whether the explosion of the fly wheel was caused by the negligence of the defendant. The defendant operated several lines of street cars by means of electricity generated in this power house and distributed from it. There were five steam engines in the engine room of the power house, three of which were in operation at the time of the explosion. Two of the three were the Cooper, Corliss & Co. engines, each of 500 normal horse power, and are designated in the record as Nos. 1 and 2, and were exactly alike. The fly wheel of No. 1 burst. The third engine was of 250 horse power. These engines consisted of a cylinder for the piston, a crank turned by the piston, a shaft to which the crank was attached which drove the fly wheel. A belt from the fly wheel of No. 1 to the pulley of a generator of electricity of 500 horse power, standing near, drove the latter with great rapidity, and thus generated the electricity, which was taken from the generator to the commutator, and from thence passed upon trolley wires over the railroad tracks. The steam was fed to the cylinder from the boilers in an adjoining boiler room from an overhead pipe. At 3 o'clock in the afternoon upon which the explosion occurred, John Herlihy, one of the three assistant engineers employed by the defendant, took charge of the power house, succeeding William Parr, who had been in charge the eight previous hours. Herlihy made an examination, and found everything in apparent good order, and working smoothly. At 3:40 o'clock he was engaged in trimming an electric lamp which was suspended from above, and was raised and lowered by a cord. This lamp was between engines 1 and 2, and was about 12 feet from the easterly side of the room. While thus engaged, his attention was arrested by the violent sparking at the generator of engine No. 1. He instantly went to the generator, about 40 feet distant, to ascertain the cause. He did not discover it. He then went to the switch board, about 12 feet further on, in a diagonal direction, and looked at the ammeters of engines Nos. 1 and 2,—that is, the measurers of the current or amount of load that each generator produces, which were attached to the switch board,—and noticed a great disparity in what the case terms the "amperage," or load of electricity, which each generator was making, and which each engine was carrying. The ammeters indicated between 700 and 800 amperes upon engine No. 1, and between 200 and 300 amperes upon No. 2. When he went upon duty, he had noticed

that each engine or generator was carrying about 400 amperes.  Engines Nos. 1 and 2 worked in multiple; that is, their aggregate product of electricity was blended so as to pass to its work in the same currents.  There were two methods of equalizing the two amperages, or loads of electricity.  One was by means of a rheostat, which was at the hand of the engineer, and was gradual in its operation,—that is, four or five minutes in completing its work; the other way, speedy, almost instantaneous.  That was to break the circuit, and then restore it; an operation performed by pulling the little handle of the circuit breaker one way, waiting a second or two, and then pulling the handle the other way.  The engineer pulled the handle one way, and broke the circuit.  Now, if the engines had both been working properly, the evidence tends to show, and the trial court so held, that the act of the engineer would have been proper; but he testified upon his direct examination, the plaintiff having called him as a witness, that as he was at the switch board, "I looked back at the engine, and I noticed it speeding up, and I pulled the circuit breaker," and then immediately went to the throttle of engine No. 1 and shut off the steam, and then was passing toward No. 2 to shut the steam off there, when the explosion took place.  He afterwards characterized this "speeding up" as "racing," and "running away." The theory of the plaintiff was that, if the engineer, before he pulled the circuit breaker, saw that his engine was "running away," it was improper for him first to pull the circuit breaker, and shut off steam afterwards; that he should have shut off the steam first, since to break the circuit was to lighten the load the engine was carrying, and thus to increase the speed of its fly wheel, and precipitate its destruction.  Upon his cross-examination the engineer said that he did not notice the engine speeding up until after he had pulled the circuit breaker, and, although he was rigorously examined by counsel upon both sides touching the matter, he adhered to the latter statement.  It may well be that when the witness testified in the words above quoted from his direct examination that he did not give attention to the order in which his pulling the circuit breaker stood to his observation of the speeding up of the engine, and that his final statement, made when his attention was directed to the order of these two acts, should have been taken as his corrected testimony.  But the learned trial judge, who saw and heard the witness, did not feel at liberty to adopt that view, and he left it as a question for the jury to determine which took place first.

The question of fact next presented to the jury was: If the engineer saw the engine was running away before he pulled the circuit breaker, was this a mistake, and did it cause the explosion?  Expert witnesses upon the side of the plaintiff testified that it was a mistake. Expert witnesses upon the part of the defendant testified that it was not.  We have already indicated the reason given by the expert witnesses for the plaintiff, namely, that lightening the load the engine was carrying would remove the obstacle to its speed.  The reasons given by the expert witnesses for the defense were that the violent sparking at the generator indicated that something was wrong with it; that the inspection of the ammeters was the next

thing to do; that, such inspection disclosing a great disparity in the loads of engines Nos. 1 and 2, that disparity should be arrested by breaking the circuit, and then seizing the throttle of the engine, and shutting off steam,—all of which would be the work of a few seconds of time; that if, while about to pull the circuit breaker, the engineer discovered that the engine was running away, he nevertheless did right in pulling the circuit breaker—the work of an instant—so as to put a stop to the trouble at the generator; that the engine had an automatic governor, so made and adjusted as to prevent the engine from running beyond the limit of safety if it was in good order; and, since it had never been known to fail in its duty, the engineer could still trust to it for the short interval between pulling the circuit breaker and seizing the throttle of the engine, the distance from the switch board to the throttle not exceeding 24 feet. Assuming that the engineer did see the engine running away, and that he made a mistake in pulling the circuit breaker before he seized the throttle, the next and graver question submitted by the court to the jury was whether this act of the engineer was either attributable to his negligence or attributable to his incompetency. We think that it was error to submit either question to the jury. The evidence shows that the engineer acted with the utmost promptness, and strictly in accordance with his best judgment upon the facts as they then appeared to him. He is not to be judged in the light of facts then unknown and since discovered, unless it is shown that, but for his negligence or incompetency, he would have known them. Burke v. Witherbee, 98 N. Y. 562, 568. But if he should be subjected to this unjust test, he should not be condemned, for nothing was disclosed upon the trial that threw any new light upon the cause of the explosion. The fly wheel was running too fast, and therefore, to employ the terms of the experts, its centrifugal force overcame its cohesive power, or tensile strength, and it burst. The engineer rightly judged that it was best to shut off steam, and stop the engine, and not to trust to the usual automatic action of the governor. If, as is now conjectured, from the nonaction of the governor, and the inability to find fault with anything else, the governor was out of order, the engineer was prompt to act upon that conjecture, and he hastened to the throttle and shut off steam. It is not urged that he was slack in discovering or in acting upon the discovery. The breaking of the circuit, as the learned judge charged, did not appreciably delay the engineer in going to the throttle. The evidence is insufficient to convict him of negligence by omission. Nor does the evidence support the finding of Herlihy's incompetency. His duties were not to construct or install these steam engines and electrical appliances, but to operate them. He was serving under the consulting engineer of the defendant, who, though not present at the time of the explosion, daily visited the works. No question is made as to the competency of the consulting engineer, and his testimony is to the effect that Herlihy acted properly upon the occasion; and the testimony of the electrical superintendent of the General Electric Company, which manufactured the electrical machines used in the power house, is to the same effect. The experience of the latter witness prac-

tically covered the entire period in which electricity had been used as the motive power for street railroads. Herlihy entered the employ of the defendant in April, 1892, as an oiler of the machinery in the power house. He had had some previous experience—not much—in operating steam engines. After three years' service as oiler, he was employed as engineer, and had served as such eight months when this explosion occurred. No fault had ever been found in respect to his capacity or carefulness. The learned counsel for the plaintiff examined him at some length with reference to his scientific attainments. It is conceivable that a person thus examined may make such answers as to convince the lay mind, unassisted by professional opinion, of his incompetency. But we do not perceive that any of his answers disclosed his incompetency for the service in which he was employed, or afforded anything more than a pretense for denouncing him. He is accused of but one wrong act, namely, pulling the circuit breaker before shutting off steam. The most that can be said of this, in view of the divided opinion of competent experts, is that it may have been an error in judgment; and, if it was, and although committed in an emergency demanding prompt action, and admitting only a second or two of time for reflection, it was such an act as experts of high rank, upon reflection, still approve. While we cannot be certain that Herlihy's action ought to be commended, it is clear that an unbiased mind cannot condemn it as evidence of incompetency. It is enough to say that the plaintiff has not maintained the burden of proof resting upon her in this respect. To convert into evidence of negligence a mistaken act of omission or commission based upon the actor's best judgment of the needs of the situation, it is necessary also to show that the error in judgment is traceable to negligence or incompetency. Wynn v. Railroad Co., 133 N. Y. 575, 30 N. E. 721; Chrystal v. Railroad Co., 105 N. Y. 171, 11 N. E. 380. It is quite clear, we think, in this case, that the weight of experience is upon the side of the engineer, and the weight of theory against him. We need not say that it is easier to procure theories than experience. In such a case, to condemn his act because it was not successful, and then to condemn him because we have condemned his act, is to proceed upon speculation, or at least upon evidence which no more tends to support the verdict than to subvert it. The burden of proof is not thus to be maintained. Baulec v. Railroad Co., 59 N. Y. 356; Hayes v. Railroad Co., 97 N. Y. 259; Linkauf v. Lombard, 137 N. Y. 417, 33 N. E. 472.

Without discussing other questions urged by the appellant, we think, for the reasons above stated, the case was improperly submitted to the jury.

Judgment and order reversed; new trial granted; costs to abide the event. All concur.