ODOM, Justice.
 

 This is a damage suit brought by twenty-one landowners of Richland Parish against the defendant, a corporation engaged in the production of natural gas. On June 20, 1932, we held that plaintiffs’ original petition failed to state a cause of action. McCoy v. Arkansas Natural Gas Co. et al., 175 La. 487, 143 So. 383, 85 A.L.R. 1147.
 

 Within one year from the date on which our judgment became final, plaintiffs filed the present suit, in which they reiterated the allegations they made in their former suit and in addition thereto made certain other allegations which were thought necessary to meet our ruling in the former suit. The defendant again excepted to plaintiffs’ petition on the ground that it set out no cause of action and later filed pleas of prescription and res adjudicata. The exception and the pleas were sustained by the trial judge, and plaintiffs appealed.
 

 We reversed the judgment of the lower court and sent the case back for answer and trial on its merits. McCoy v. Arkansas Natural Gas Co. et al., 184 La. 101, 165 So. 632.
 

 Plaintiffs alleged in their original petition that on January 30, 1928, the defendant completed a gas well which had an open flow capacity of 65,000,000 cubic feet per day, with 1,125 pounds gas pressure; that, through the fault and negligence of the defendant and its employees, the well “blew out”, cratered, and ran wild for more than three years, during all of which time immense quantities of gas escaped. They further alleged that they owned lands within a radius of one mile from the wild well and that immense quantities of gas escaped from their lands into the crater and thence into the air; that they were damaged to the extent of the value of the gas which had escaped from their lands. They alleged that, during the 1,165 days which intervened between the date on which the defendant negligently permitted its gas well to crater and the date on which the well was finally brought under control, there escaped and was wasted from their lands an average of 40,000,000 cubic feet of gas per day; and alleged that, in order to bring the wild well under control,, defendants had drilled relief wells
 
 on
 
 the same tract of land, which wells drew an average of 5,-000,000 cubic feet of gas per day over and beyond what would have been produced from the 93 acres of land. They further alleged that the market value of the gas at the well was 10(é per thousand cubic feet and that in the aggregate they had suffered damages amounting to $1,-055,312.50.
 

 It is unnecessary to state here the specific allegations of negligence relied upon by plaintiffs, because these are set forth in detail in our first opinion, handed down June 20, 1932. In that opinion we said, 143 So. 384:
 

 
 *335
 
 “The plaintiffs do not charge that there was any willful or intentional wrongdoing on the part of the defendant in allowing the gas to escape • from its well. . The charges .of negligence amount to nothing more than that the employees in charge of the drilling operations for the defendant used what the plaintiffs deem had judgment in drilling the well, in allowing the gas pressure to burst the casing, and in failing to bring the escaping gas under control soon after the-casing burst.”
 

 In that case we said further:
 

 “The fact that the plaintiffs in this case are the owners of all of the lands within a radius of a mile from the well complained of does not except the suit from the rule stated in Louisiana Gas & Fuel Co. v. White Bros., 157 La. 728, 103 So. 23; that is, that a landowner has no right or cause of action for damages against an owner, of adjoining land for negligently permitting a .well near the line to blow out and allowing the gas to escape; the only remedy being an action to enjoin the waste. In that case the plaintiff claimed damages for the same cause of action that is set forth by the plaintiffs in this case; and the court said:
 

 “ ‘The defendant filed an exception of no cause of action, which was overruled by the court below and renewed in this court. This exception is well founded.’ ”
 

 We quoted at length from the case of Louisiana Gas & Fuel Co. v. White Bros., 157 La. 728, 103 So. 23, where it was held that the owner of land is not the owner of the fugitive minerals, such as oil and gas, beneath the surface of the land, and further that, even if the landowner did own such minerals, it would be impossible for him to prove the damage in case another had negligently caused or permitted gas or oil to escape from his land, the reason being that it would be impossible to make proof of the exact quantity which had escaped.
 

 But in the course of our opinion, after expressing the view that plaintiffs could not prove any specific amount of damage under the allegations of their petition, we said further:
 

 “It is conceivable, therefore, that a case might be presented where a landowner would be entitled to damages ‘for loss or impairment of his oil or gas rights by some fault of a neighbor on his own land. But the fault in such a case would have to consist of something more than a mere exercise of bad judgment on the part of the neighbor in drilling on his own land, and the loss sustained by the complaining neighbor would have to be measurable, approximately, if not exactly, in money. An illustration of a case where such damages could be estimated would be one where the market value of the plaintiff’s land or mineral rights is impaired by the fault of his neighbor.”
 

 In their second suit plaintiffs reiterated the allegations of negligence made in the first suit and added that defendant was •guilty of willful and intentional faults and neglects. They specifically alleged that the defendant deliberately and intentionally used second-hand casing which it knew had deteriorated and was weak; and which it knew was not of sufficient
 
 *337
 
 strength to withstand the gas pressure, and that, after gas began to escape from around the casing, defendant knew there was danger and willfully and intentionally failed to take any action to.prevent the explosion and crater. which soon followed ; that defendant willfully and intentionally employed drillers whom it knew to be incompetent and inexperienced in handling drilling operations in the Richland field; that, after the well got out of control and went wild, defendant willfully and intentionally failed to take steps- to control or kill it.
 

 In other words, according to the second petition, the defendant willfully, deliberately and intentionally inflicted upon plaintiffs the enormous hurt and damage which they alleged they had sustained. Plaintiffs made another drastic change in their pleadings. Instead of basing their quantum of damage on the value of the gas drained from their lands, they alleged as a basis for the amount of damage that the commercial value of their lands for mineral purposes had been practically destroyed.
 

 In its answer defendant denied that it had been guilty of. negligence in any respect. It especially averred that it had made timely and diligent efforts to save the well, pursuing the best known and recognized methods for stopping the flow of gas after it became known that something unforeseen and unusual had happened to the well.
 

 The case finally went to trial on its merits before a jury. The verdict was in favor of the plaintiffs, and damages were assessed against the defendant in favor of each of the landowners. The defendant appealed.
 

 This is a tort action. It is grounded upon the general proposition that:
 

 “Every act whatever of man that causes damages to another, obliges him by whose fault it- happened to repair it.” Civil Code, Article 2315.
 

 It follows necessarily that, even though the well drilled by defendant within close proximity to plaintiffs’ lands did get out of control, crater, and run wild for more than three years, and even though the effect of the loss of vast quantities of natural gas through this crater was to deplete the gas field and render plaintiffs’ lands practically worthless for mineral purposes, thereby inflicting upon them enormous loss and damage, plaintiffs cannot recover in the absence of proof that their loss was due to the fault of defendant.
 

 At the trial of the case on its merits,, plaintiffs’ counsel made no effort to prove their allegations that defendant “willfully, deliberately and intentionally” inflicted the injury and damage of which they complain, although those allegations were relied on by counsel in support of their argument that the petition in their second suit set out a cause of action. In the absence of allegations in the second suit that the acts of negligence charged against defendant were committed knowingly, deliberately and intentionally, a plea of res adjudicata might have been sustained on the
 
 *339
 
 theory that our first opinion is the law of this case. So that the allegations that defendant had willfully and intentionally inflicted injury upon plaintiffs were made' for the definite purpose of making the petition in the second suit conform to our ruling in the first suit.
 

 Counsel discussed at the bar and in brief the question whether, under the circumstances, it was necessary for plaintiffs to prove that defendant was guilty of willful and intentional wrongdoing in order to make out their case. We shall not discuss the point, the reason being that in our opinion the testimony fails to show that defendant was guilty of any negligence at all.
 

 The so-called “wild well” was drilled by the Rambin & Roberts Drilling Co., under contract with the defendant company. The well was completed on a Sunday and, in compliance with the rules and regulations of the Conservation Commission, was capped, or closed, as soon as completed. The rules of the Conservation Commission require that all gas wells be closed and kept closed until officially gauged and the rock pressure taken. The official gauging showed that the well had an open flow capacity of 65,000,000 cubic feet per day and a pressure of 1,125 pounds per square inch.
 

 The modus operandi of drilling this well was explained by Joe DeSoto, day driller for Rambin and Roberts, contractors, as follows: They started with an 18-inch drill bit and with it drilled to á depth of 203 feet. At that depth they set 15%-inch casing. This casing was set in concrete by the Halliburton Oil Well Cementing Co., which has all the machinery. and equipment necessary for doing such work and is employed to do that kind of work by many of the drilling contractors in the Richland and other oil and gas fields in that section of the country. A smaller bit was then used inside of the larger casing and with it the well was drilled to a depth of 913 feet, when 10-inch casing was set by the Halliburton Co. They then used a smaller drill bit, one small enough to go inside the 10-inch casing, and with it drilled to a depth of 2,292 feet and set 6%-inch casing in cement. This cementing was also done by the Halliburton Co. After this smallest string of casing was set in cement and the proper time had elapsed, they drilled through the cement at the bottom of the smallest casing down to the gas formation, and the well was “brought in”.
 

 So that to a depth of 203 feet there were three strings of casing, the outside casing being 15% inches in diameter. Inside that was the 10-inch casing, and inside the 10-inch casing was the 6%-inch casing. Below the bottom of the outside, or largest, casing, there were two strings of pipe down to a depth of 913 feet below the surface of the ground, the larger being 10 inches in diameter, and inside that the smaller string 6% inches in diameter; and from the bottom of the 10-inch casing down to the bottom of the well there was only the smallest string.
 

 The well was completed on a Sunday, tested in the usual way and then capped. There were present at the time a number of persons, among them being Louis Mis
 
 *341
 
 trot, District Superintendent for the Arkansas Natural Gas Co.; Hugh Rambin and J. I. Roberts, the contractors who drilled the well, and Laten Stanberry, Supervisor of the Oil and Gas Division of the Texas Railroad Commission, who said that the Texas Railroad Commission had the same duties with regard to the supervision of the oil industry as does the Department of Conservation of Louisiana. There was also present a representative of the Louisiana Conservation Commission, Mr. Duncan S. Cook. These men were all familiar with drilling operations and the bringing in of wells. They noticed nothing unusual about this one.
 

 When the well was capped there was a slight leakage of water and gas coming up between the strings of casing. But Joe DeSoto, the day driller, and a number of other competent and experienced men said there was nothing unusual about that, and but little attention was paid to it. Joe Anderson, a member of the night drilling crew, who was left to watch the well during the night after it came in, noticed a leakage of yater and said in his testimony, “Well, we always had water flows there, always the two jobs I was on, water flow come up between the two casings, on this one”.
 

 The testimony supports the conclusion that the well was in good condition at the time it came in and immediately after it was capped. Those present, some of whom were experts, noticed nothing out of the ordinary about the well.
 

 But when W. W. Smith, the defendant company’s drilling foreman, went to the well early on the following day, he found it “vibrating slightly as if it were feeding”. He said in his testimony, “I concluded that something must be wrong but didn’t know what”. He went to another well nearby, which was in process of drilling, to get a pressure gauge, and he said that while there Joe DeSoto, the day driller, came for him, “and told me the vibration had increased and that it looked as if something serious was happening”.
 

 So it appears that no one knew that anything out of the ordinary had happened to the well until Monday morning, the day after the well was brought in. Conditions grew worse rapidly, and within a few days the well was completely out of control. It cratered, and the derrick fell in.
 

 The question whether defendant’s employees took proper precautions within and during the first three days to prevent the well from going to ruin is highly pertinent. Plaintiffs’ counsel say in their original brief at Page 38:
 

 “After the wild well cratered, defendant drilled two relief wells with commendable speed. We are glad to express approval of this one thing defendant did. For the first two months, defendant did all that could be done.”
 

 Evidently counsel for plaintiffs did not mean to concede that defendant did all that could be done for the first two months. What they meant, no doubt, was that during the two months after the well cratered, defendant did all that could be done, because one of the high points stressed by them is that defendant did nothing during the first three days to prevent the catas
 
 *343
 
 trophe. At Page 8 of their original brief they say:
 

 “Here is the remarkable part of this case. Smith, defendant’s field foreman in charge of the well, did nothing. For the three precious days from Sunday morning to Wednesday noon, when the trouble at the well could have been easily cured, neither Smith nor any of defendant’s employees, did one blessed thing to cure the trouble.”
 

 They cite the pages of the transcript where the testimony on which they rely to support this assertion may be found. We have read the cited testimony with care. While there are statements in the testimony of some of the witnesses relied on, which, if not read in connection with their whole testimony, would indicate that nothing was done during the first three days, yet, when the testimony is read as a whole, it is perfectly clear that it utterly fails to support the last above quoted statement from counsel’s brief.
 

 Counsel cite Page 269 of the testimony. There is where a portion of the testimony of W. W. Smith, defendant’s Field Foreman, is found. He testified that nothing was done during the first, day, the reason being that neither he nor anyone else knew that anything out of the ordinary had happened to the well until early Monday morning (the well was brought in on Sunday afternoon), when he, Smith, went to the well and found it vibrating. He says he went immediately to another well to get a pressure gauge. When he went back to the well, accompanied by Joe DeSoto, day driller, and an agent of the Conservation Commission, he and the others saw that something had gone wrong. Laten Stanberry, whom we have already mentioned, was at the well when they got back. These, working together, immediately opened all of the valves. Water flows developed, and the ground around the well began to cave. Smith says that he at once called Mr. Mistrot, Field Superintendent, who was in El Dorado, Arkansas, and asked him to come at once. He said he knew that cement and baroid would be needed in the operations of saving the well, and he immediately ordered
 
 1,000
 
 sacks of cement and several hundred sacks of baroid to be delivered at the well, and communicated with the Halliburton Oil Well Cementing Co., requesting that its equipment be sent at once. (One of Halliburton’s men testified that the equipment was at the well within three or four hours after notice.) All this, he said, took place on Monday. Mistrot came as soon as notified and took charge. Smith said that all the men and trucks available were used to haul cement and baroid.
 

 Another witness whose testimony is cited is Duncan S. Cook, who was Inspector for the Minerals Division of the Louisiana Conservation Commission at the time this well was drilled, and who had gauged it. His testimony was taken by commission. He said that the well was in charge of Smith. He was asked (Interrogatory No. 20) what Smith did to remedy the trouble. His answer was, “There was nothing'done immediately. He left the well open and sent for his superior, who I believe was Mr. Mistrot”. This testimony is found on Page 499 of the transcript, the page cited by counsel. They evidently rely on this state
 
 *345
 
 ment to support their assertion that “for the three precious days * * * neither Smith nor any of defendant’s employees, did one blessed thing to cure the trouble”.
 

 But evidently counsel overlooked Mr. Cook’s answer to Interrogatory No. 28. We quote it:
 

 “The first two days there was nothing done except placing of gravel on the outside of the surface casing as this was beginning to wash. The third day they attempted to pump mud and water in the top of this well, this caused the pressure to increase and the flow of water and gas on the outside of the well to also increase doing only damage in my opinion.”
 

 Red Randall, whose testimony is also cited, made contradictory statements. He said once that nothing was done at the well from the time it was completed to the time it cratered. Again he said, “We worked on it for two days waiting for the order to tear the rig down”. He said also that nothing was done the first two days. He seemed to be confused and had no distinct recollection of what was done.
 

 Joe Walker, another witness for plaintiff on this point, said at Page 565 of the transcript that they did nothing on the first day and, on being asked what, if anything, was done to remedy the trouble, said they hauled gravel “and throwed in' there after the first day. On the third day they put Halliburton’s pump on it. They pumped mud and water into it. That’s all I saw they did”.
 

 Bill Mays, another witness, said (Page 584 of the transcript) that the first day they did nothing; the second day he saw them unloading cement but saw them do nothing else, and the third day “They were running a pipe from the Halliburton Pump to the Christmas Tree”.
 

 Milwee ’ said he visited the well twice during the three days and saw nothing being done.
 

 MacDonald did not say that nothing was done. What he said was that “No efficient work was accomplished toward bringing the well under control”. He said that, before the derrick fell in, which was after the third day, “some water was pumped into the well under pressure, which was inadequate under the circumstances, as it had the effect of increasing the pressure, exerted on the leak”.
 

 J. M. Roberts, a plaintiff, said that during the first three days nothing was done except to' throw sacked sand and gravel into the hole around th.e piping.
 

 Burkett; a tenant on the Thomason land, said they pumped water down the well, but he was not sure when that was.
 

 Thomason, a plaintiff, said all he saw them do to save the well was to throw gravel and dirt into the crater on the second day.
 

 J. M. Sartor, a plaintiff, said, “They hauled a little gravel in there, I think the second or third day, put around where it was cratering around the casing.” (Transcript, Page 838.)
 

 Ryan Sartor, another plaintiff, was asked whether anything was done to cure the trouble and said (Transcript, Page 866), “Well, about the second day all I saw them
 
 *347
 
 do was after it started to cratering they put some sacks of sand and gravel-stuff in there to keep it from caving in”. He was asked, “And when you went back the third day what did they seem to be doing?” He answered, “Well, the only thing I saw them do they tied into the Christmas tree with a pipe tried to pump some water in about only thing besides putting these sacks around the casing”.
 

 The testimony of the witnesses referred to by plaintiff, when read as a whole, conclusively shows that some action was taken by defendant to save the well prior to the end of the third day after it came in. The testimony of other witnesses shows positively that -action was taken, and also what was done. Within the three days the company’s employees ordered the necessary cement and baroid, used all available men and trucks to haul it to the well, attempted to stop the flow of gas and water by packing sacked sand or gravel around the casing, summoned Halliburton Oil Well Cementing Co. to come immediately with its high-pressure pumps and other equipment, used their own pumps then at the well in an attempt to pump mud into the casing to kill the well, notified the Conservation Commission of the conditions and asked for advice and assistance, and called on experts. Furthermore, the testimony of other witnesses makes it perfectly clear that not later than Wednesday noon the Halliburton Co. had its high-pressure pumps at work in an attempt to force mud, etc., into the well in order to stop the flow of gas. These facts are disclosed by the testimony of DeSoto, Hopkins, Rambin, Anderson, Mistrot, Walker, and others.
 

 Other specific acts of negligence now urged by counsel for plaintiff are listed in their original brief, and we shall discuss them as listed.
 

 As the first six specifications all relate to the casing used in the well and the testing of it before being used, we shall discuss these six points together.
 

 Counsel for plaintiff made no serious effort to prove that old, second-hand casing was used in the well. Red Randall and one or two of the plaintiffs testified that the casing used was not new. But counsel in their brief do not stress that point. The casing used was purchased from the Youngstown Sheet & Tube Pipe Mill, to be used in this well. Counsel seemed to concede this, because the first specification of error in their brief is “buying for the wild well the lightest, cheapest casing obtainable”. The testimony shows beyond question that new casing was used in the well. But it is argued that the casing was too light to withstand the pressure required by law, which is 1,400 pounds.
 

 The testimony shows that the casing in question was tested at the factory by competent men and that it withstood a pressure of from 1,400 to 1,500 pounds. The testimony shows further that the casing was tested at the well and withstood a pressure of 1,500 pounds.
 

 Specification of error No. 3 is “Failing to have the casing tested by competent testers as required by law”. The testimony shows that the J. M- Supply Co., of Monroe, Louisiana, was employed to test the casing at the well. That company put in charge of the testing a colored man named Singleton
 
 *349
 
 Manuel, referred to as “Big Six”, who was assisted by five other colored men. Mr. Scoggins, shop foreman of the J. M. Supply Co., stated with reference to the qualifications of “Big Six” that he had tested practically all the pipe with which the company had anything to do and that he was thoroughly competent. Mr. Scoggins further testified that he visited the well while the pipe was being tested, and the work was being carried on properly. Plaintiff offered no testimony to show that the crew in charge of the testing was incompetent. The bare suggestion by counsel that the pipe was tested by a crew of incompetent negroes is entitled to no consideration in the absence of some testimony to support the assertion that they were in fact incompetent.
 

 Mr. Scoggins testified that his concern was employed by many oil and gas producers to test casing. It must have been thought that his crew was competent to do the testing; otherwise the firm would not have been employed.
 

 The fourth specification of error is “Failing to give any supervision to the testing at the well”. While Mr. Scoggins was not present during the entire time the pipe was being tested, yet he did visit the well more than once during the time the pipe was being tested and said that it was being done right. Smith and Joe DeSoto and other witnesses testified that they saw the pipe tested and, so far as they knew, the work was done well. The testimony shows that approved methods were used. If, as a matter of fact, “Big Six” was competent — and there is no testimony showing that he was not — it was not necessary that someone else be present all the time to supervise the work:
 

 The fifth specification of error is “Working the negro testing crew 36 hours without rest”. “Big Six” testified that they began testing one day, worked 'on during the night and a portion of the next day, approximately thirty-six hours. They did not stop to rest. But there is no testimony that indicates that their energies and efficiency were impaired by their labors during that time. The argument made by counsel that they became inefficient and incompetent because of their continuous labors for that length of time is based upon assumption pure and simple. While the crew did go without sleep, they were furnished food.
 

 The sixth specification of error is “Putting into the well, casing tested and found to be defective”.
 

 There is no proof that this was done. “Big Six”, the foreman of the testing crew, testified that he found several pieces of casing defective and that he tied pieces of rope around the defective joints to indicate to the drilling crew that they were not to be used. Counsel’s argum'ent that some of this defective casing was used in the well is based on the statement that only 2,310 feet of 6%-inch casing was delivered at the well; that “Big Six” said that he found several joints of piping defective; that 2,292 feet of this casing were put into the well, which would leave only 20 feet, or one joint, of casing not used. Therefore, some of the defective casing must have been put into the well.
 

 
 *351
 
 There would be force in this argument if it had been shown that only 2,310 feet of piping were tested at the well. The facts are that “Big Six” testified that he tested at that location- about 200 joiqts of pipe. The testimony shows that the average length of the joints was about 20 feet, so that there must have been approximately 4,000 feet tested instead of 2,310.
 

 There is in the record a bill made out by the J. M. Supply Co., Inc., showing a charge for testing “215 joints of 6%" pipe at Hugh Rambin Rig”. According to this bill, this service was rendered on January 5, 1928, and the well was being drilled about that time. This corroborates the testimony of “Big Six” that he tested about 200 joints of pipe at that location.
 

 If there had been only 2,310 feet of pipe tested at the Rambin Rig, as counsel suggest, it would be reasonable to conclude that some of the defective casing “Big Six” found was used in the well. But the testimony shows that at least 4,000, feet, or more, were tested there.
 

 The seventh specification of error is “Having in charge of the field an inexperienced and incompetent 'field foreman”. The field foreman referred to is W. W. Smith, a young man about 24 years old at the time this well was drilled. It is not stated in what respect. Smith was incompetent to perform the duties for which he was employed, except that he was young and that up to a short while prior to the drilling of this well he was an office man. The well was drilled by the Rambin & Roberts Drilling' Co., Inc., and the actual drilling operations were under its supervision and were directed by its employees. Smith was in the field, and Mr. Dickerson, General Superintendent for the defendant company, said that Smith’s duties were to rustle material for the well and to check the pipe. He said he relied on the contractors to do the drilling and that he himself, and not Smith, was in charge of the field, Smith being a subordinate. Smith himself testified that he had two immediate superiors; that H. R. Dickerson was General Superintendent, and Louis Mistrot was Field Superintendent; that Mr. Dickerson’s position was supervisory over all the company’s operations, and that Mr. Mistrot was under Mr. Dickerson and carried out his orders in the field. Smith said his duty was to see that the contract between the contractors who drilled the well and the company was- performed and that it was his duty to see that material was furnished at the. proper times and to see that the casing was set and teste.d. This does not mean that he actually directed the operations in the drilling of the well and the setting of the casing, because Mr. Dickerson said that he looked to the contractors to drill the well, and the testimony shows that the setting and the cementing of the casing was done by the Halliburton Oil Well Cementing Co.
 

 It is suggested that Smith, inexperienced as he was, did not know what to do when it was discovered that something had gone wrong with the well. That is no doubt true. But the testimony shows that as a matter of fact no one knew precisely what to do. It seems that there are- about as many theories as to what were proper steps to be taken as there were men who viewed
 
 *353
 
 the situation. Mr. Chisholm, the Director of the Minerals Division of the Department of Conservation, testified that, when he got to the well and saw the situation, he immediately summoned representatives of the various companies operating in the field to a conference to be held in Monroe, his purpose being to get the- advice and cooperation of those engaged in'the drilling business; and that there were in that conference about fourteen men, and during the first session, which was at night, no agreement was reached as to what should be done. There were various and- conflicting opinions expressed'that night, and no method of procedure was agreed upon until the second conference, which was held on the next day.
 

 Smith did not pretend to know just what method should be pursued in order to save the well. But he was active, notified his immediate superiors to come at once, notified the Department of Conservation, ordered materials, and summoned the Halliburton Co. There is no proof that, if a more experienced man .than Smith' had been present, the results would have been different.
 

 The eighth’ specification of negligence is “Employing a drilling. crew not experienced in high pressure gas”. The well ’ was drilled by Rambin & Roberts Co., and the testimony shows beyond question that they were competent and responsible contractors. In fact, there is no testimony at all to show that they were not. The testimony further shows that the drillers employed by them were competent and experienced men. See testimony of Stovall, Walker, Daniels, Norris, Anderson, Hopkins and Rambin. Counsel for plaintiffs refer in their brief to Louis Mistrot as “an experienced old driller”. Mistrot went to the scene as soon as notified and took charge. Smith disappeared from the picture.
 

 As relates to the drilling contractors and their crew not being “experienced in high pressure gas”, it was shown that they had already had some experience in drilling wells in the Richland field. It is probably true that no drilling crew could have been found who had had experience in drilling wells where the pressure was as high as it was at this particular well. As a matter of fact, no other well in the Richland field tested as high as this one.
 

 The ninth point relates to the delay of three days before taking action. This point has already been discussed.
 

 The tenth specification of negligence is that defendant failed to use proper, and well known methods “to cure the trouble” before the well cratered.
 

 The argument on this point is mainly a criticism of the methods used by defendant to save the well. Counsel .have listed in their brief four methods, any of which they.argue, if used, would have prevented the loss.
 

 One of the methods suggested is: “Hook up a powerful pump to the top of the main casing, and pump muddy water, heavy with mud or baroid, down the casing”.
 

 This is the method which was used by defendant in this case. Those in charge of the well tried to force water and mud into the well with the pumps they had at
 
 *355
 
 the
 
 well. They
 
 did not succeed because these pumps were not powerful enough. Halliburton’s men soon arrived with the most powerful pumps obtainable. They tried to pump mud, etc., down the well from the top. They failed because the gas pressure was too great.
 

 Another method suggested by counsel is the “snubbing in” process, which is described by Mr. Patton as follows: “Run a string of heavy tubing or small drill pipe to the bottom of the hole, pumping fluid thru this string of pipe. This may be called snubbing pipe into the well”. The purpose of this process is to kill the well from the bottom. This “snubbing in” process is the method which Foster Brigance said he would have used if the defendant had accepted his offer to kill the well for $1,000.
 

 One of the witnesses called by counsel for plaintiffs was Mr. H. L. Patton, who qualified as an expert in the business of extinguishing oil well fires, capping wells which are out of control, and the handling of craters. He said he operated “practically all over the United States”. His opinion is especially relied on by plaintiffs.
 

 Speaking of this particular well, he said, “If the proper actions and methods had been used, the crater could have been controlled”. One of the methods he suggested was the “snubbing in” process, which he thought would have been successful.
 

 Mr. Herbert C. Otis, another eminent expert, who said he was in the business of running tubing into high pressure wells by a patented process and whose business he said extended from coast to coast, was called as a witness for defendant. He was asked whether pipe could have been “snubbed” into the Thomason well. He said, “Well the pipe simply could not have been put into that well at that time”. He said it would have been utterly foolish to try. He explained that at the time this well was brought in there was no controlling equipment available by which the pipe could have been run into the well against closed pressure; that it would have been necessary to open the well in order to snub the pipe in, and, if it had been open, the pressure and the sand would have cut the connections and would have cut the clothes off the men and ripped the skin and flesh off their hands and arms. He -said that in his experience he had seen such conditions prevail at wells where the pressure was much lower than that at the Thomason well. He explained, however, that, with his equipment which he had invented and patented since this well was brought in, he could kill a well of like pressure by this “snubbing in” process. He could now kill a well of like pressure by using the “snubbing in” process, but it could not have been done, he said, at that time.
 

 He was asked whether in his opinion the tube could have been “snubbed” into that open hole and replied, “I say absolutely could not. I think the statement it could is ridiculous.”
 

 As to technical matters of this kind, where such experts as Mr. Patton and Mr. Otis differ so widely in their opinions, it is impossible for us to decide what method should have been adopted to control the
 
 *357
 
 so-called wild well under the circumstances shown to exist there. We don’t know and can’t know. Whether this well could have been saved by any known method of procedure is doubtful.
 

 Mr. Laten Stanberry, another eminent expert who was a member of Chisholm’s advisory committee, was asked whether in his opinion representatives of the owners of the well did all that could be done and whether they were in good faith, and said, “I think they were and at one meeting of the committee a long time before the Conservation Commission permitted them to stop work on it, I told them I didn’t think anybody but the Lord could do anything with that well”.
 

 The experts agree that there are several methods of procedure recognized and approved by oil and gas producers to keep a gas well from getting out of control, or, when out of control, to bring it back under control when an unforeseen situation presents itself, as was the case here. And they concede that it is frequently impossible for those in charge to determine definitely just what is the best method to pursue in any given case. In such cases they must pursue the course dictated by their best judgment.
 

 Regarding the particular circumstances which existed in this case, Mr. Patton was asked, “Was not the course to be adopted a question of judgment?” His reply was, “Sure, the course to be adopted should always be your best judgment considering the conditions of the job at the time you begin with the operations”.
 

 Mr. Stanberry said in substance that no one could tell what would kill a gas well until it was killed. He was asked what was the right method to pursue, and his answer was, “The right method is — go about it, try and make your first guess, try that. If that don’t work guess again”.
 

 The method pursued by defendant in this case failed. It may have been the wrong one. ■ It is possible, of course, that some other method might have been successful. No one can tell. But, if it be conceded that defendant did use the wrong method, it cannot be said that its mistake, under the circumstances shown to exist, amounts to negligence.
 

 In the case of Boston, Cape Cod & N. Y. Canal Co. v. Seaboard Transportation Co., 1 Cir., 270 F. 525, the court said [page 529]:
 

 “Obviously, when prudent and careful men, equally competent to judge of a difficult and doubtful situation, hold diametrically opposite views as to which of two courses is safer, it cannot be negligence to adopt either course. In such cases, there is no normal from which to depart.” McCoy v. Arkansas Natural Gas Co., 175 La. 487, 143 So. 383, 85 A.L.R. 1147; Staloch v. Holm, 100 Minn. 276, 111 N.W. 264, 9 L.R.A.,N.S., 712; Piehl v. Albany R. Co., 19 App.Div. 471, 46 N.Y.S. 257.
 

 The eleventh specification of negligence is defendant’s “failure to drill third relief well”, and the twelfth is “in action on crater for three years”.
 

 Discussing defendant’s failure to drill a third relief well, counsel for plaintiffs in
 
 *359
 
 their brief say at Page 38 that, after the wild well cratered, “defendant drilled two relief wells with commendable speed”, and they express approval of this and say that “For the first two months, defendant did all that could be done”.
 

 The testimony shows that the reason why defendant did not drill additional relief wells until about 1931 was that it was thought by experts and a committee composed of representatives of the operators in that field that, under the circumstances, it would be futile to do so. The reason was that the pressure was so great that nothing could be accomplished by that procedure. Mr. Chisholm, Director of the Minerals Division of the Conservation Commission of Louisiana, was of the opinion that the crater could not be closed. He so testified, and on January 26, 1929, nearly one year after the well cratered, and after approved methods had been pursued and had failed not only for saving the well but for killing it after it cratered, he wrote the following letter to the Arkansas Natural Gas Corporation, which letter is found in the. transcript, Volume II, Page 257:
 

 “Gentlemen:
 

 “After a conference with the operators’ committee of the Richland Parish Gas Field, and a study of the work already done on Thomason C-l well drilled by the Natural Gas and Fuel Corporation of El Dorado, Arkansas, in Section 21, Township 16 North, Range 6 East, Richland Parish, Louisiana, under permit No. 11289, we are forced to the opinion that every reasonable method of attempting to control this well in its present condition has been tried by your company. The work has been done with the aid and advice of the operators’ committee and under the direction of the Department of Conservation. It is understood that your company agrees to adopt such measures as may be advisable for control of the well in case present conditions change sufficiently to make feasible further efforts towards killing the well.
 

 “Yours very truly,
 

 “W. F. Chisholm,
 

 “Director, Minerals Division.”
 

 This letter shows that it was contemplated that the company would renew its efforts to control the well in case conditions changed sufficiently to make feasible further efforts. Mr. Chisholm, acting for the Conservation Commission, had full authority to require the defendant to take further steps, and it, is reasonable to assume that, if he had thought the conditions which prevailed between the date of his letter and the early part of 1931, when the well was finally killed, were such as to make it feasible to attempt further activities, he would have so advised, and would have required action on the part of the defendant.
 

 The State of Louisiana has a tremendous monetary stake in its natural resources, and has enacted laws to conserve them and has authorized the Conservation Commission to take full charge and control of sit
 
 *361
 
 uations like the one here presented. Mr. Chisholm, representing the Conservation Commission, did take charge in this case. He gave orders, and his orders were obeyed. One of the first things he did after going to the scene was to call in experts as well as those interested in the Richland field, to advise with him as to what 'steps should be taken. He states in the letter just quoted that it was written after a conference with the operators’ committee of the Richland gas field and states that “we” (meaning himself and the committee) were “forced” to the opinion that every reasonable method of attempting to control the wild well had been tried by the company.
 

 Counsel in their brief at Page 41 say that the reason defendant did not act was not due to the difficulty of closing the crater, but “it was defendant’s unwillingness to spend any money”. This statement is not borne out by the facts. It is in evidence and not disputed that, first and last, there was spent on this project $195,103.46. This, we understand, includes the original cost of drilling the well. The balance of that sum was spent in efforts to save it and to prevent the loss which inevitably followed.
 

 For the reasons assigned, the judgment appealed from is reversed and set aside, and plaintiffs’ demands are rejected at their costs.
 

 FOURNET, J., concurs.
 

 HIGGINS and ROGERS, JJ., absent.