## IVEY v. PHILLIPS PETROLEUM CO.
### No. 79.

District Court, S. D. Texas, Corpus Christi Division.

Jan. 7, 1941.

Sewell, Taylor, Morris & Connally and W. J. Knight, all of Houston, Tex., Mc-Craw & Holt, of Dallas, Tex., Young & Easterling, of Corpus Christi, Tex., and James A. Stanford, of Austin, Tex., for plaintiff.

R. K. Batten, of Houston, Tex., John E. Lyle, of Corpus Christi, Tex., and T. L. Dyer, of Austin, Tex., for defendant.

ALLRED, District Judge.

Plaintiff, a resident citizen of Texas and the owner of an 800-acre farm in San Patricio County, Texas, sued defendant, a foreign corporation, for damages to the surface of his land and for injuries to the oil and gas bearing sands under his land.

Defendant owns an oil and gas lease, with four producing wells, on 500 acres of plaintiff's farm.

In July, 1938, one Harlan Grimes owned and operated a 40-acre lease on the Coggin lands offsetting the 500-acre lease on the south. Grimes had drilled two wells on this lease. His No. 2 well was brought in as a producer on July 13, 1938, and produced oil and water until about the 18th of July, at which time an attempt was made

to run a squeeze job in an effort to cut off the water.

Early on the morning of July 20, 1938, the well began to blow out and caught fire under the boilers. It was first evidenced by escaping gas about fifty feet from the top of the well. This continued until the main blowout occurred some 300 or 400 feet southwest of the well, at which point a crater formed through which enormous amounts of gas, oil, mud and other formations were emitted, forming an enormous cavity or crater, burning and heaving from the surface of the earth.

Grimes and his associates, after removing the rig and machinery from the well, made a number of efforts to bring the well under control, including the running of one inch tubing through the two inch tubing already in the well; and the pumping of 2,000 sacks of baroid, as well as large quantities of mud, clay, cottonseed hulls and other substances. They failed, however, to bring the well under control and finally gave up.

On July 27th, no one else appearing to be desirous of trying to kill the well, Grimes and his associates executed a release to defendant, exempting them from any claims for damages by reason of defendant's intended attempt to stop the blowout. The release recited that it was clearly understood that defendant was "under no obligation whatsoever to stop or attempt to stop the blowing out of said well."

Phillips employed Otis Pressure Control Company and numerous others in an effort to kill the well. The two inch tubing was pulled and a hole was found in the 51st joint. All of the tubing was pulled in an effort to determine whether there were any other defective joints. Then, after replacing the 51st joint, an effort was made to re-run the tubing equipped with a packer. It could only be re-run to a depth of approximately 1,200 feet.

The tubing was then pulled again, the packer removed and the tubing re-run into the well to a depth of approximately 1,270 feet, where some obstruction was encountered. The tubing was then pumped and spudded about 80 additional feet after encountering the obstruction. This was about the 7th day of August, 1938, and on the following day the Otis Pressure Control people stopped work. On the 10th day of August they withdrew and removed their equipment, except one control head, which was left attached to the top of the well.

Beginning about August 13th, defendant pumped over 3,000 sacks of Cal-Seal and other substances followed by clear water into the tubing. After that their men and equipment were moved off the lease because the well was cratering at its top, rendering it extremely hazardous to continue the work. The only work done by defendant after August 27, 1938, was in removing its equipment and tools away from the lease.

Defendant had nothing whatever to do with the well or its operation before it cratered and caught on fire, and was under no obligation to try to kill it. Defendant, nevertheless, spent several thousand dollars in an effort to bring the well under control.

A receiver of the Harlan Grimes lease and properties was afterwards appointed in the State District Court of San Patricio County upon the application of plaintiff and other adjacent royalty owners. Numerous hearings were held before the Railroad Commission of Texas looking to the determination of some method by which the well could be killed; and the entry of an order therefor. Nothing was done about it, however, probably due to the fact that the Grimes receivership properties were not of sufficient value to justify the expense.

The well continued to crater and burn in terrific fashion until about November 6, 1938, at which time it subsided for about eight days, when it again became extremely active. The crater enlarged and emitted large quantities of formation including salt water, mud and other substances. Dikes were thrown up and enlarged from time to time until the acreage enclosed by the dikes covered approximately 30 acres.

The well continued to erupt near the top of the hole and was out of control for about a year. About July 19, 1939, it bridged itself and ceased to erupt.

Plaintiff's cause of action, as submitted to the Court in requested charges, was based upon two theories:

First: That defendant had committed "waste" under the Texas statutes, Articles 6014 and 6015, Vernon's Revised Civil Statutes of Texas, resulting in the damages complained of.

Second: That irrespective of the waste statutes, defendant was negligent in the

manner and method in which it tried to kill the well; and that such negligence was the proximate cause of the damages and injuries sustained by plaintiff.

At the conclusion of plaintiff's testimony and again at the conclusion of all the evidence, defendant moved for an instructed verdict. The Court overruled these motions but carried them along with the case and submitted it to the jury: first, upon the general issue as to defendant's alleged negligence; second, upon special questions as to whether defendant had committed acts denominated as "waste" under the Texas statute, Art. 6014, supra. These questions were submitted, with considerable misgivings, at the earnest insistence of plaintiff's counsel, the Court stating to counsel at the time that he did not believe defendant could be held liable under the provisions of the conservation statutes.

The jury returned a general verdict in favor of defendant upon the negligence theory tendered by plaintiff; and in response to question No. 1 found that the fact that the well had caught fire and cratered before defendant ever attempted to kill it was not the sole proximate cause of plaintiff's injuries. The jury disagreed upon the answers to the other questions as to whether defendant committed acts constituting "waste" under the statute.

Based upon the jury's general verdict defendant has tendered a judgment; plaintiff opposes the entry of such judgment and has filed a motion that the Court set aside the general verdict and declare a mistrial.

I have concluded that judgment should be entered for defendant for the following reasons:

■ First: Because, under all the facts, defendant is not subject to the terms of the Texas waste statutes, Articles 6014, 6015, and 6049c, Sec. 13.[1]

■ Article 6014 prohibits and declares unlawful the *production, storage,* or *transporation* of oil or gas in such a manner as to constitute "waste"; and defines "waste." It deals with the operation of a well in *producing, storing* or *transporting* oil or gas—in other words, only with the *general operation* of wells and leases. The Commission is not even limited by this article to the statutory definition of "waste" in its consideration of other facts and circumstances in making "rules, regulations or orders to prevent waste of oil or gas."

■ Clearly, it seems to me, it would be a strained construction of the statute to hold that defendant, by reason of any of the acts or omissions charged against it, comes within Article 6014.

■ Likewise as to Article 6015,[2] which only applies to all operators, etc., *"drilling for or producing * * * or piping* oil or gas,"* etc. This latter statute, it will be observed, requires such operators to use "every possible precaution * * * to prevent * * * waste of oil and gas * * * in *drilling* and *producing* operations, *storage* or in *piping* or *distributing* * * *,"* etc. This statute clearly applies to *drilling* and *producing* operations, not to a person or concern voluntarily going on premises where a wild well was already cratered and burning, as did defendant, without obligation, in an effort to stop such waste.

No provision of the Texas conservation statutes, Title 102, has been pointed out dealing, either expressly or by implication, with a wild cratered or burning oil well.[3] Nor has any order of the Railroad Commission, general or special, been cited im-

---

[1] These statutes were enacted pursuant to the natural resource conservation amendment to the Texas Constitution, art. 16, Sec. 59(a), Vernon's Ann.St. The history of these statutes is reviewed in Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 87 S.W.2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1393, a case involving construction of spacing rule 37 of the Texas Railroad Commission (to which the enforcement of the conservation laws has been entrusted). This case also contains a detailed discussion of property rights both before and since the enactment of the State's conservation laws. See also, Magnolia Petroleum Company v. Blankenship et al., 5 Cir., 85 F.2d 553.

[2] "All *operators, contractors,* or *drillers, pipe line companies,* or *gas distributing companies, drilling for or producing* crude oil or natural gas or *piping oil or gas for any purpose* shall use every possible precaution in accordance with the most approved methods to stop and prevent waste of oil and gas or both, in *drilling and producing operations, storage or in piping or distributing,* and shall not wastefully utilize oil or gas, or allow same to leak or escape from natural reservoirs, wells, tanks, containers or pipes." (Italics supplied.)

[3] Art. 6004 imposes certain duties upon the owner or operator of a drilling well to provide good and sufficient casing, etc. Art. 6005 imposes specific duties upon an

posing any special duty or method of dealing with such wild well upon an operator or owner, much less a volunteer who goes on the premises, after a well has gone wild and has been abandoned, as did defendant; although the statutes give the Commission broad powers, as pointed out in Brown v. Humble Oil & Refining Co. (footnote 1 supra) to deal with every phase of operation in connection with conservation of the State's natural resources.

The State simply has not legislated as to the duties of an operator in case of a "wild well." Probably, under the broad powers conferred on the Railroad Commission to prevent "waste," it could promulgate general rules and regulations on the subject; and, after hearing, order an operator to adopt specific methods to kill or bring such a well under control. Cases cited by plaintiff as to the meaning of the words "operation" and "operations,"[4] are not helpful.

Article 6049c, Section 13, is a part of the Acts of the 42nd Legislature of 1931, granting additional powers to the Railroad Commission, including the securing of injunctions, etc. It provides: "Sec. 13. Nothing herein contained or authorized, and no suit by or against the Commission, and no penalties imposed upon or claimed against any party violating any Statute of this State, or any rule, regulation or order of the Commission, shall impair or abridge or delay any cause of action for *damages*, or other relief, any owner of any land or any producer of crude petroleum oil or natural gas, or any other party at interest, may have or assert against any party violating *any rule, regulation or order of the Commission*, or any judgment herein mentioned. Any party owning any interest in any property or production which may be damaged by any other party violating this *Act* or *any other Statute of this State prohibiting waste or violating any valid rule, regulation or order of the Commission, may sue for and recover such damages*, and have such other relief *as he may be entitled to in law or in equity*." (Italics supplied.)

It is extremely *doubtful whether this* section of the statute, relied upon by plaintiff, creates any cause of action, Magnolia Petroleum Co. v. Blankenship et al., 5 Cir., 85 F.2d 553, 556, wherein Judge Sibley states that the first sentence does not purport to give any new cause of action; and that the second sentence "gives a property owner or producer who is damaged by another * * * a right to sue, but only to 'recover such damages, and have such other relief *as he may be entitled to in law or in equity.*' The general principles of *law and equity thus remain the standards * * *.*" (Italics supplied.)

A landowner has no cause of action against his neighbor for draining the oil and gas from under his land. Hunt v. State, Tex.Civ.App., 48 S.W.2d 466, (in which the cause of action arose, and the decision was written, after the effective date of Article 6049c.)

The only Texas authority cited by plaintiff is Peterson v. Grayce Oil Co., Tex. Civ.App., 37 S.W.2d 367, affirmed by the Texas Supreme Court, 128 Tex. 550, 98 S.W.2d 781. In that case the plaintiff's right to recover damages against the lessee under an adjoining lease for use of a vacuum pump in producing oil was upheld. The use of such vacuum pump, however, had been *expressly prohibited* by *a rule* promulgated by the Texas Railroad Commission. Here, as pointed out, no statute or order of the Commission covers the actions of defendant in attempting to kill the wild well after it had been abandoned by Harlan Grimes.

The only other cases cited by plaintiff are Palmer Corp. v. Collins, 214 Ky. 838, 284 S.W. 95, and Atkinson v. Virginia Gas & Oil Co., 72 W.Va. 707, 79 S.E. 647, 48 L.R.A.,N.S., 167. In both cases a right to damages was recognized for violation of a statute imposing *specific duties* upon operators abandoning wells, similar to the requirements of Article 6005, of the Texas statutes. Moreover, *in the Kentucky case*, a general statute expressly authorized a person, injured by the violation of *any* statute, to recover from the offender such damages as he may have sustained, although a *specific* penalty for such violation was also imposed by law.

---

owner or operator about to abandon a well. Plaintiff, however, did not rely upon these statutes and they are not applicable to the facts in this case.

[4] Schwab v. Peterson, 80 Mont. 214, 260 P. 711; Utilities Prod. Corp. v. Carter Oil Co., D.C.Okl., 2 F.Supp. 81; Transcontinental Oil Co. v. Mid-Kansas O. & G. Co., 5 Cir., 29 F.2d 323; Altom v. Mt. Vernon Oil & Gas Co., 174 La. 775, 141 So. 457; and Fleming Oil & Gas Co. v. South Pennsylvania Oil Co., 37 W.Va. 645, 17 S.E. 203.

Although Article 6049c has now been in effect more than nine years, and during practically all that time orders of the Texas Railroad Commission have been in effect limiting the quantity of oil which may be produced from various wells and leases, no case has been decided where a landowner has recovered damages from the lessee of an adjoining tract for overproduction and resulting drainage. Yet, since such overproduction would constitute "waste," and would be in violation of both the law and the orders of the Commission, [5] under plaintiff's theory, an action for damages for drainage would lie.

Plaintiff's theory, submitted to the Court in a trial brief, was that an action for damages will lie under Section 13, Article 6049c, for damages for the violation of *any* provision of the conservation statutes, or an order of the Commission promulgated thereunder, whether such acts constituted negligence or not. In other words, that a violation of a statute or an order of the Commission constitutes negligence per se, as under the general rule established by the cases, that where a statute requires or forbids the doing of an act, a violation of such statute constitutes negligence as a matter of law. 30 Tex.Jur. § 66, p. 729. A statement of the rule, however, demonstrates what has already been declared—that some statute, or order of the Commission, must be clearly applicable to the situation. Such is not the case here.

Suppose that after defendant abandoned its efforts to control the well, plaintiff had appealed to the Railroad Commission for an order [6] requiring defendant to drill a directional well; [7] and the Commission, after hearing, had ordered defendant to drill a directional well. Defendant would probably have appealed to the Texas courts for relief. It can hardly be conceived that the courts would have sustained such an order as to defendant; but if they had, and defendant failed to comply with the order, it would constitute negligence per se; there would have been a clear duty imposed on defendant by order of the Commission.

Plaintiff did not plead, nor did he prove that had it not been for defendant's actions he, or any other person or concern, would have saved the well, or have killed it by drilling a directional well. He simply alleged that defendant should not have pulled all the tubing out of the well; but having done so should have attempted to drill through the obstruction or bridge in the well; and that defendant should not have pumped the Cal-Seal in between the casing and the tubing. Plaintiff then says that such actions produced waste condemned by the Texas statutes; or that it was negligence and resulted in his damage.

Again, as to the provisions of Article 6015, requiring the use of "every possible precaution in accordance with the most approved methods," even if defendant could be said to be subject to the provisions of this statute, there was no evidence whatever as to the most approved methods. Plaintiff's experts testified that each wild well presented a problem within itself; that the methods employed upon one might not apply to another.

Further, that *they* would not have pulled all of the two inch tubing from the well, but would have replaced the defective 51st joint and have tried to re-run the tubing into the well. Plaintiff's witness McIntosh testified that he would have used what he called a "swedge" (an unpatented article which he had used several times), instead of the packer which defendant used. Another witness, Patton, [8] an expert, testified that he would have used a choke instead of the packer and have re-run the tubing. The most that can be said for the testimony of plaintiff's experts is that they would have used other methods than defendant employed and, in their opinion, they could have killed the well by their methods within a short time; and that, in their opinion, the methods employed by defendant were hazardous.

---

5 Art. 1112b, Sec. 7a, Vernon's Penal Code, declares overproduction to be unlawful. Sec. 9 makes violation of *any* rule, regulation or order a felony, punishable by confinement in the penitentiary for from two to four years.

6 A procedure clearly contemplated by the conservation statutes; Magnolia Petroleum Co. v. Blankenship, supra.

7 Failure to drill a directional well was one of the acts of negligence complained of by plaintiff.

8 He also testified as a witness in McCoy et al. v. Arkansas Natl. Gas Corp., 191 La. 332, 185 So. 274, a "wild well" case where the evidence was held insufficient to show negligence.

■ This is far from establishing an "approved method" for killing a wild well; and in the absence of some practice common to the industry or a regulation of the Railroad Commission, there was no basis whatever for attempting to submit the case under Article 6015.

It was for these reasons that the Court stated, at the time of submitting special issues tendered by plaintiff as to defendant's alleged violation of the waste statutes, that in his opinion defendant could not be held liable under the provisions of the Texas conservation statutes.

Second: Because the Court submitted, upon the general issue, plaintiff's theory of negligence and the jury returned a general verdict for defendant upon that issue.

■ The Court charged the jury that defendant was under no obligation to kill the well; but having attempted to do so, defendant owed plaintiff the duty to exercise ordinary care in its attempt to kill the well so as not to injure plaintiff;[9] that if defendant failed to exercise ordinary care and such failure was the proximate cause of plaintiff's damage, then the jury was authorized to find for plaintiff according to the measure of damages stated.

This instruction was in keeping with the principles enunciated in Comanche Duke Oil Co. v. Texas Pac. Coal & Oil Co., Tex.Com.App., 298 S.W. 554, where a lease operator was held liable for negligent use of explosives resulting in physical damage to his neighbor's oil and gas bearing strata. The instruction was also based upon a case referred to the Court by plaintiff's attorneys just prior to the jury charge. Empire Oil & Refining Co. v. Hoyt, 6 Cir., 112 F.2d 356.

As stated, the jury found for defendant upon plaintiff's action for negligence. There was no pleading before the Court at the time of the trial *and no charge was requested* upon the theory of *trespass.*[10]

■ There was no conflict between the general verdict for defendant as to plaintiff's right to recover for negligence, and the jury's finding, in response to question No. 1 that the fact that the well had already cratered and was on fire before defendant went on the lease and attempted to kill the well, was not the sole proximate cause of plaintiff's injuries.

The Court instructed the jury that there could be more than one *proximate cause;* that "sole proximate cause" meant the *only* cause. Defendant's pleadings did not raise eo nomine the defense of sole proximate cause. The answer did, however, set up the fact that the well had been drilled by Harlan Grimes, that it had cratered and caught fire before defendant ever went on the lease. The evidence disclosed, without dispute, difficulties encountered by Grimes in bringing in the well, especially as to its possible defective perforation, the drilling out of the plug, etc. The evidence further disclosed the efforts of Grimes and his associates to bring the well under control for about a week before he abandoned it.

The Court felt that the evidence clearly raised the issue as to whether the condition of the well, either alone or in connection with the acts and omissions of Harlan Grimes and his associates before de-

---

[9] Defendant contended that it was not liable to plaintiff, even for negligence, because it owed no duty to plaintiff. Pullman Co. v. Caviness, 53 Tex.Civ.App. 540, 116 S.W. 410; Galveston, H. & S. A. Ry. Co. v. Brown, 95 Tex. 2, 63 S.W. 305; Fort Worth & D. C. Ry. Co. v. Rogers, Tex.Civ.App., 62 S.W.2d 151, 154; Independent Eastern Torpedo Co. v. Carter, Tex.Civ.App., 131 S.W.2d 125.

Having undertaken to kill the well, however, defendant was in duty bound to exercise ordinary care so as not to injure plaintiff or his property. Rick Furniture Co. v. Smith, Tex.Civ.App., 202 S.W. 99; Missouri, K. & T. Ry. Co. v. Wood, 95 Tex. 223, 66 S.W. 449, 56 L.R.A. 592, 93 Am.St.Rep. 834; Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S.W. 517.

[10] The right to recover for *trespass* by use of explosives is discussed incidentally by the Texas Comm. of Appeals in Comanche Duke Oil Co. v. Texas Pac. Coal & Oil Co., supra, but the case was tried and disposed of on the theory of *negligence.*

In Green v. General Pet. Corp., 205 Cal. 328, 270 P. 952, 60 A.L.R. 475, and In re Deep Rock Oil Corp., D.C.Okl., 16 F. Supp. 777, plaintiff's right to recover damages for trespass caused by a blowout of defendant's well on an adjoining tract is recognized.

As to trespass in general, see also 41 Tex.Jur. p. 415; McDaniel Bros. v. Wilson, Tex.Civ.App., 70 S.W.2d 618; Steger v. Barrett, 58 Tex.Civ.App. 231, 124 S.W. 174; Universal Atlas Cement Co. v. Oswald, Tex.Civ.App., 135 S.W.2d 591.

fendant ever entered upon the scene, was the sole proximate cause of the injuries of which plaintiff complains.[11]   The injuries and damages of which plaintiff complained were sustained over a one-year period. The well had, according to the evidence, possibly been defectively drilled or brought in by Grimes and his associates. It had cratered and caught on fire. It had possibly been negligently handled by Grimes and his associates (in other words, they could have brought the well under control as easily as defendant could) while it was on fire. Defendant's efforts to kill it covered less than thirty days. Thereafter, for more than ten months, the well was wild, erupting and burning.

The jury found in response to question No. 1 that the fact that the well had gone wild and cratered, either alone or together with any acts done or omitted by Harlan Grimes before the defendant ever attempted to kill the well, was not the *sole proximate cause* of the damages and injuries which plaintiff claimed to have sustained. This finding is not inconsistent with the finding made under the general issue to the effect that the defendant was not negligent or that its negligence was not the proximate cause of plaintiff's injuries.

The jury may have concluded that the fact that the well was wild for over ten months after defendant moved off the lease, or that the receiver or someone else did not drill a directional well, was a proximate cause of plaintiff's injuries and, therefore, prevented the prior condition of the well and the acts or omissions of Harlan Grimes from being the *sole proximate cause.*

Special verdicts and interrogatories are authorized by Rule 49(a, b) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. It would have been difficult to submit the case upon both of plaintiff's theories for general verdict; especially since the Court was of the opinion that defendant could not be held liable under the waste statutes. In order, however, to give plaintiff an opportunity to have a jury finding, if possible, upon the facts alleged to constitute waste, the Court submitted questions 2, 3, 4, and 5. The fact that the jury disagreed upon an answer to these questions does not prevent the Court from entering a judgment upon the general verdict; especially since, upon mature consideration, I am more than ever convinced that plaintiff is not entitled to go to the jury at all upon the issues tendered under the waste statutes.

Third: Because, even though I may be mistaken as to the entry of a judgment upon the general verdict, defendant's motion for an instructed verdict should have been sustained on account of the insufficiency of the evidence.

Verdicts cannot rest upon guess or conjecture. This rule applies both as to the basis of recovery (i. e., negligence, violation of the waste statutes, or proximate cause), Doggett v. Peek et al., 5 Cir., 116 F.2d 273, decided Dec. 11, 1940; and the necessity for a reasonable basis for computing damages. Shannon v. Shaffer Oil & Refining Co., 10 Cir., 51 F.2d 878, 78 A.L.R. 851.

The burden of proof was upon the plaintiff. As pointed out above, he wholly failed to show any facts bringing the defendant under the provisions of the Texas conservation statutes.

### As to Negligence.

The sum and substance of the testimony of plaintiff's expert witnesses is to the effect that there was no set method of bringing wild wells under control; that many had been brought under control, some after only a short time and others after considerable periods of time; that the witnesses, themselves, would not have used the methods employed by defendant; that, in their opinion, such methods were hazardous; that they would have used other methods which, in their opinion, would have brought the well under control, but, even so, they too, might have failed.

There are no Texas cases dealing with suits for damages caused by wild or cratered wells. Three Louisiana cases, however, are highly persuasive that the evidence in this case is insufficient to sustain an action for damages based on negligence; Louisiana Gas & Fuel Co. v. White Bros., 157 La. 728, 103 So. 23; McCoy et al. v. Arkansas Natural Gas Co., 175 La. 487, 143 So. 383, 85 A.L.R. 1147; McCoy et al. v. Arkansas Natl. Gas Co., 191 La. 332, 185 So. 274. In these cases the suits were

---

11. Montrief & Montrief v. Bragg, Tex. Com.App., 2 S.W.2d 276; Montrief & Montrief v. Fort Worth Gas Co., Tex. Com.App., 4 S.W.2d 964; Homan v. Borman, Tex.Civ.App., 19 S.W.2d 438.

against the owners of the wild wells; and, for that reason, the evidence of negligence, dealing in part with the methods of drilling the wells and failing to take certain precautions before they caught fire, was even stronger than here.

## As to Proximate Cause.

Under any theory of the case, whether negligence, violation of a statutory duty, or trespass, the acts or omissions of the defendant must have been a proximate cause of the injuries complained of. As pointed out, the well had possibly been defectively brought in. It had caught on fire and cratered. It had been just as negligently dealt with by Harlan Grimes, so far as failure to bring it under control is concerned, as it was subsequently negligently dealt with by defendant. There is no contention that defendant had anything to do with the well getting into the condition it was when defendant attempted to kill it. Common sense would compel the conclusion that its condition before defendant ever entered on the premises was the proximate cause of plaintiff's damage.

A finding, under these circumstances, that defendant's acts or omissions were a proximate cause of plaintiff's injuries is necessarily farfetched guess work. It overlooks the previous condition of the well, it assumes that, if defendant had not entered upon the premises at all, plaintiff or someone else would have been successful in killing the well (which plaintiff did not plead or prove); it assumes that, if defendant had adopted other measures, the well would have been brought under control without any damage whatever to plaintiff's property.

This case is not unlike Owen v. Cook, 9 N.D. 134, 81 N.W. 285, 47 L.R.A. 646, where plaintiff's property was destroyed by a prairie fire and defendants started a back fire to protect their camp; and Lebanon, L. & L. Telephone Co. v. Lanham Lumber Co., 131 Ky. 718, 115 S.W. 824, 825, 21 L.R.A.,N.S., 115, 18 Ann.Cas. 1066, a suit against a telephone company for damages sustained because defendant's telephone operator did not promptly answer a call intended to rouse a fire company to put out a fire already in progress; and similar cases from Missouri and Texas: Forgey v. Macon Telephone Co., 291 Mo. 539, 237 S.W. 792, 19 A.L.R. 1413; Southwestern Tel. & Tel. Co. v. Thomas, Tex. Civ.App, 185 S.W. 396.

## As to Damages.

Plaintiff plead as his measure of damages:

(a) The difference between the value of his royalty under the leased lands[12] "prior to the occurrence of the matters herein alleged and after the occurrence of same";

(b) the difference between the value of the oil and gas in place under 200 acres, then remaining unleased, "prior to the occurrence of the matters herein alleged and after the occurrence of same";

(c) for the value of 19 acres, the surface of which was totally and permanently destroyed.[13]

Plaintiff produced petroleum engineers who testified as to the value of the royalty under the leased lands, as well as the oil and gas in place under the unleased lands, *before the blowout;* the amount of oil and gas that would have been produced by reasonable development, etc.;[14] and the value of such minerals after the lands had been drained and the productivity of the sands impaired by the blowout (which continued for approximately one year). Due allowances were made for the amount of oil produced up to the time of and since the blowout, as well as for a discount.

The record is utterly void, however, of any evidence whatever concerning the extent of the damage done before defendant ever went on the lease; or since de-

---

[12] 500 acres leased to plaintiff and 100 acres to another at the time the well went wild.

[13] This by trial amendment. The evidence both as to the value and the total and permanent destruction of said 19 acres was very meager.

[14] This is probably the proper method of proving damages in suits for failure to drill, properly develop and *protect against drainage;* Texas Pac. Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.2d 1031, 60 A.L.R. 936; Julian Pet. Corp. v. Courtney Petroleum Co., 9 Cir., 22 F.2d 360; Sinclair Oil & Gas Co. v. Bryan, Tex. Civ.App., 291 S.W. 692; Texas Pac. Coal and Oil Co. v. Barker, Tex.Civ.App., 252 S.W. 809; Blair v. Clear Creek Oil & Gas Co., 148 Ark. 301, 230 S.W. 286, 19 A.L.R. 430; but in those cases there was no question as to the defendant being responsible for the *entire* damage, however uncertain the amount might be.

fendant abandoned the well. In fact, no witness even made an estimate as to either of such items. Nor did the experts attempt to give the jury any basis whatever for calculating or separating the damage attributable to the condition of the well either before or after. defendant attempted to kill it. While the evidence may show that only a small amount of oil and gas was consumed through the crater or the well before defendant went on the lease, yet, beyond question, a tremendous amount of damage had already been done to the field, including plaintiff's property. The well was wild; it had cratered and was on fire.

This suit was not one for failure to develop and protect against drainage as in the cases cited under footnote 14 supra. It was for acts, negligent or otherwise, which produced physical damage to plaintiff's property and impaired its value. The fact of drainage was only one of the elements considered by the experts in fixing the amount of *all such impaired* value.

A simple restatement of the case shows that there was no joint concert of action between defendant and Harlan Grimes or any others in producing the injuries to plaintiff's lands or minerals, even if defendant could be held to have contributed to such injuries. The jury was instructed that defendant could only be held for such damages as were the proximate result of its acts.

This instruction was in keeping with the Texas rule that when wrongdoers act independently and not in concert or unity of design, each is liable only for the part of the injury or damages caused by his own wrong. Sun Oil Co. v. Robicheaux, Tex.Com.App., 23 S.W.2d 713.

Of course it is a fundamental and cardinal principle of the law of damages that an injured party shall have compensation for the injuries sustained, West Lumber Co. v. C. R. Cummings Export Co., Tex.Civ.App., 196 S.W. 546; Shell Pet. Co. v. Scully, 5 Cir., 71 F.2d 772; and a wrongdoer is responsible for the natural and probable consequences of his acts or omissions, whether in tort or contract, Humble Oil & Refining Co. v. Wood, Tex. Com.App., 292 S.W. 200; and the fact that the amount of damages is uncertain or difficult of ascertainment does not prevent recovery. 13 Tex.Jur. §§ 10, 11, 12, 13, pp. 77–82. While uncertainty as to the amount of damages definitely attributable to a wrong does not preclude recovery, yet it does apply to such damages as are not the *certain result of the wrong*. Story Parchment Co. v. Paterson Paper Co., 282 U.S. 555–562, 51 S.Ct. 248, 75 L.Ed. 544.

And, where there is no reasonable basis or standard for determining the amount of damages chargeable to a defendant's conduct, there can be no recovery. Tucker Oil Co. v. Matthews, Tex. Civ.App., 119 S.W.2d 606; Sun Oil Co. v. Robicheaux, supra; Shannon v. Shaffer Oil & Refining Co., 10 Cir., 51 F.2d 878, 881, 78 A.L.R. 851.

The latter case discusses in detail the rule that where there is proof, within the permissible range of certainty, a plaintiff should not be denied recovery because of the difficulty in accurately measuring the damages. As stated therein, "the later authorities recognize the distinction between the case where uncertainty exists as to whether any substantial damage resulted, and the case where the uncertainty exists only as to the extent of such damage."

Paraphrasing the language of the Court in the Shannon case, and applying it to this case: "It should not be assumed that defendant, with nearly seven times as much at stake as plaintiff, would have failed to kill the well, if by reasonable diligence it could have done so. But, even if it be assumed that the evidence of defendant's lack of care was undisputed, there is still the question of whether plaintiff afforded the jury any reasonable basis for computing his loss. * * This court has studied the record carefully and is unable to arrive at any rational estimate of the amount of damages chargeable to defendant's acts."

Plaintiff's difficulty, as to damage, is that it was well nigh impossible to give the jury *any* possible standard by which the amount or extent of his damages, chargeable to defendant, could be reasonably determined.

Judgment will be rendered on the verdict, for defendant; and, in the alternative, on the insufficiency of the evidence.

Plaintiff's motion to set aside the verdict and declare a mistrial will be overruled.

The Clerk will notify counsel.