HIGGINS, Justice.
 

 This is an action to recover damages to the crops, buildings, farm equipment, machinery, etc., of the plaintiffs, alleged to have been caused by the “blowing out” of a well on July 20, 1941, while being drilled by the defendant in search of oil near the village of Hayes in Calcasieu Parish. Several members of the Henderson family filed a petition of intervention setting forth that they were the owners of one hundred eighty-four acres .of land, which had been leased to the plaintiffs for a rental fixed at one-sixth of the crops raised thereon, and that they were entitled to recover one-sixth of the damages to the crops on the said tract of land, as shown by the plaintiffs’ petition. They prayed for judgment accordingly.
 

 The defendant in its answer admitted that the well which was being drilled by it for oil got out of control and so remained from July 20, 1941 until August 13, 1941; that it caught afire approximately twenty-four hours after it blew out; that while it was out of control, it expelled and emitted large quantities of gas, sand, salt water, distillate, and other substances; and that at the time of the “blow out” the well had been drilled to a depth of 10,534 feet. The respondent denied liability, averring that it' was free from fault.
 

 The plaintiffs asked for- a trial by jury and after a lengthy hearing a unanimous verdict was rendered in favor of the plaintiffs for an amount less than that claimed and in favor of the intervenors as prayed for.
 

 The defendant filed a motion for a new trial and after a hearing and argument of counsel thereon, it was overruled and the judgment was entered and signed. Thereupon, the defendant was granted and perfected a suspensive appeal to this Court.
 

 The plaintiffs seek to fasten liability on the defendant strictly and absolutely under
 
 *947
 
 the doctrine of “Sic títere tuo, ut alienum non laedas” (“So use your own that you do not injure that of another”), citing Article 667 of the Revised Civil Code; Green v. General Petroleum Corporation, 205 Cal. 328, 270 P. 952, 60 A.L.R. 475; Summers Oil and Gas, Perm. Ed., Vol. 4, p. 17 et seq.; McFarlain v. Jennings-Heywood Oil Syndicate, 118 La. 537, 43 So. 155; Tulane Law Review, Vol. XVII, pg. 159, etc.; Tulane Law Review, Vol. VI, page 354 et seq. and Law of Torts, Harper, (1933) pages 333, 334.
 

 The defendant counters by stating that the doctrine of liability without fault in tort cases such as the instant one has not been recognized in this State and liability could only be predicated upon negligence, relying upon McCoy et al. v. Arkansas Natural Gas Corporation, 191 La. 332, 185 So. 274, and Loesch v. R. P. Farnsworth & Co., La.App., 12 So.2d 222.
 

 Pretermitting any discussion of this interesting question and assuming but without deciding that the position of the defendant is correct, a view most favorable to it, we pass to a consideration of the applicability of the doctrine of res ipsa loquitur.
 

 The drilling of an oil well requires complicated and involved machinery which is under the sole control of the operator thereof. While an oil well is being drilled, it does not “blow out” as a general rule. A person who is injured or damaged by such a happening could not be expected to have information as to the cause of the well getting out of control, whereas the operator would be informed thereof. The jurisprudence is clear that where damages are caused by an instrumentality under the exclusive control of a defendant and they would not ordinarily, have occurred if the party having control thereof had used proper care, the doctrine of res ipsa loquitur applies. Ross v. Tynes, La.App., 14 So.2d 80; Ortego et al. v. Nehi Bottling Works et al., 199 La. 599, 6 So.2d 677; Nuss v. MacKenzie, La. App., 4 So.2d 845; Gulf Ins. Co. v. Temple, La.App., 187 So. 814; Jones v. Shell Petroleum Co., 185 La. 1067, 171 So. 447; and Gershner v. Gulf Refining Co., La. App., 171 So. 399.
 

 Under this principle of law, the evidence showing the happening of the accident and the resulting damages establishes a prima facie case and the burden is placed upon a defendant to exculpate itself from fault. Joynes v. Valloft & Dreaux, La.App., 1 So.2d 108; Royal Ins. Co. v. Collard Motors, La.App., 179 So. 108; Dotson v. Louisiana Cent. Lbr. Co., 144 La. 78, 80 So. 205; and Noble v. Southland Lumber Co., 4 La.App. 281.
 

 The defendant in a damage suit coming under the doctrine of res ipsa loquitur must show that he did not do anything that he should not have done, that he left undone nothing he should have done and that he neglected no legal duty owed to the plaintiff. Vargas v. Blue Seal Bottling Works, 12 La.App. 652, 126 So. 707; Horrell et al. v. Gulf & Valley Cotton Oil Co., 15 La.App. 603, 131 So., 709. It is our opinion that the above rule of law governs this case.
 

 
 *949
 
 The trial judge charged the members of the jury if they should find from the evidence that the defendant, either with or without negligence, drilled the well and permitted it to get out of control, resulting in damages to the plaintiffs, it was liable therefor and the jury should fix the amount of damages in dollars and cents. We are, therefore, not in a position to determine whether or not the jury predicated its verdict, in so far as liability is concerned, upon negligence or the doctrine of liability without fault. The defendant complains on this score. However, this circumstance as well as the correctness of the judge’s instructions to the jury become immaterial because this Court is required, under the law, to review all of the evidence, which is now before it, and determine finally therefrom whether or not it shows that the defendant is liable.
 

 In January 1941, the defendant’s employees began the drilling of a well for oil upon leased lands located in the Hayes area of Calcasieu Parish. After setting 13% inch surface casing to a depth of 1885 feet and cementing it, the well was drilled to a depth of 9200 feet. In the beginning of March 1941, 9% inch casing was set and cemented at this depth and connected with a well head, guaranteed by its manufacturer to withstand a pressure of 6,000 pounds per square inch, hydraulicly tested. (The well head is that part of the drilling equipment between the surface of the ground and the drilling platform.) The bottom of the hole was cemented so as to prevent any gas or oil from seeping into the well. In March 1941 the well head connections were tested by the defendant with a pressure of 1800 pounds, cold water test. About that time the same connections were also tested by the representatives of the Conservation Department at a pressure of 1300 pounds, cold water test, as required by the regulations of the Department. After setting the 9200 feet of 9% inch casing, the defendant proceeded to drill with an 81/2. inch bit to a depth of 10,534 feet. Seven thousand, nine hundred and twenty-seven (7927) feet of 7 inch casing was placed in the hole from the
 
 bottom
 
 and extended upward into the 9% inch casing a distance of 1593 feet. In the drilling process, the defendant took cores regularly and had ascertained the presence of gas sand reservoir near the bottom of the hole. As a precaution against the hazard of either caving or a blow out, the defendant set 2600 feet of the seven inch steel casing by filling and sealing the space between it and the 9% inch casing by pumping in 740 sacks of cement under a pressure of 2300 or 2400 pounds. On July 16, 1941, the bottom of the 7 inch casing at the depth
 
 from
 
 10,527 to 10,529 feet was perforated for the purpose of cementing the bottom of the casing on the outside thereof, preparatory ' for deeper drilling. Twenty-four shots were 'electrically fired to make these perforations or orifices and mud began to “shoot out” of the top of the well. When the perforator cable and gun were removed and the master valve closed there developed quickly a pressure of 600 pounds to the square inch on the casing and the well head connections. Immediately upon the development of this pressure, realizing the defendant
 
 *951
 
 was in a predicament, an effort was made by its representatives to tighten all bolts upon the well head holding the connections together, but they were already as tight as they could be drawn. Whether this condition was caused by the gas pressure or existed because these bolts were properly fastened originally is not explained by the defendant. The Halliburton Company was telephoned to come with its equipment to lubricate the well and it began this operation on the morning of July 17, 1941, and continued the lubrication until 4 o’clock p. m. on July 19, 1941. On the night of July, 16, 1941, after the perforations were made and the 600 pound pressure developed, the defendant also immediately ordered a special 7 inch “blow out” preventer consisting of two 7 inch preventers with 7 inch master valve between them, all welded together as one unit, to be brought from the Evangeline Field in Acadia Parish, a distance of 60 miles, and a Hydrill rotary to be brought from Pearce Junction, Texas, 200 miles away, to be used for “snubbing in”. It took six hours for this •equipment to arrive and would require two hours to install it. The special
 
 7
 
 inch blow out preventer was installed but not the Hydrill rotary. The “snubbing in” method of controlling the well was never resorted to or employed. After the Halliburton Company stopped lubricating the well at 4 o’clock on the afternoon of July 19, 1941, nothing further appears to have been done to the well, and at 9 o’clock that same evening a leak developed in one of the well head connections at the point between the “Studded Adapter” and the “Adapter Spool”. These two pieces of equipment are made of alloy steel and have flanges on them with “V” type grooves into which the circular gasket ring is inserted. The two parts are then bolted together to form an air tight connection or joint. At 7 o’clock p. m., on July 20, 1941, while the defendant’s employees were just starting to pump “Cal-Seal”, a mixture of rapidly drying and quick setting plaster paris, into the well for the purpose of killing it, the well blew out at the well head connection where the leak had appeared. The pressure on the gauge about that time was 5100 pounds to the square inch.
 

 There are three methods of controlling or killing a well, in order to prevent a “blow out”: (1) “Lubricating”, (2) “Snubbing in,” and (3) “Cal-seal”. The first consists of pumping mud, that is, clay mixed with certain chemicals, into the well under pressure so as to form a column of it with sufficient weight and strength to finally seal off the escaping gas. During this operation the gas forces its way through the mud and is bled off by means of a valve at the top. The second, by snubbing or placing drilling pipe or stem and bit into the well under pressure and using it to circulate and to force down the mud pumped into the well under' pressure to eventually seal' off the gas. The third, pumping a sufficient amount of plaster of paris preparation, which hardens and sets within thirty minutes, into the well, in order to form a plug to close the avenue through which the gas is escaping. It appears that the latter two methods are considered superior to the first one.
 

 
 *953
 
 After the well blew out, the defendant employed M. M.' Kinley, of Oklahoma, a specialist on combatting “blow outs” and threatened “blow outs”, and he arrived in Lake Charles on the night of July 20, 1941, and conferred with the defendant’s Assistant Superintendent of Production. Mr. Kinley, on the morning of July 21, 1941, went on the property and took charge of the operations in an effort to control the well. He immediately tightened the other connections. Seventy-three men and special equipment amounting to $109,000 were assembled, of which $67,000 was used in efforts to bring the well under control. Mr. Kinley remained in charge for twelve days and gave up the work when the well began to crater, the risk of human life then being too great. The well continued blowing until August 13, 1941, when, as a result of the cratering, it bridged over and killed itself.
 

 The defendant’s Assistant Superintendent of Production, who was in charge of drilling operations in the southwest Louisiana and had direct control and supervision of the drilling of the well in question, admitted that at the time the defendant began the drilling of this well, he knew from previous investigations that the Hayes area was a very high gas-pressure one, especially around 10,000 feet, and that he knew of a gas pressure of 6100 pounds per square inch having been' recorded by one of the two wells of the Shell Oil Company in that area, both of which blew out in 1934; that one of these wells was one and one-quarter miles from the well involved in this case; and that the Stanolind Oil & Gas Company lost or had a well “blow out” in the Hayes area in 1935, about five miles away, due to excessive gas pressure. These were the only three wells drilled in the Hayes area up to the time the well in question was ‘ drilled. He and the men working under him also knew at the time they started drilling the well that the company had three malleable steel gasket rings, two of which had been used in prior operations and, from visual examination, appeared to be in good condition and that the third one had been purchased new. The low carbon steel or “Anco iron” gasket ring is inserted between the “Studded Adapter” and the “Adapter Spool” to make the connection, and the joint is drawn together by twenty 1% inch steel bolts. The gasket ring is soft and pliable enough to make a seal so as to prevent gas, water and oil from passing through the connection.
 

 The defendant’s representative who had charge of setting up the well head was unable to state whether or not one of the two used gasket rings or the new gasket ring was put into the particular connection where the leak and “blow out” occurred, but said that he had inspected all of them before they were placed in the well head and they appeared to be all right. Neither he nor any of the defendant’s witnesses say that before or after installing them the two used rings were subjected to any pressure test, which would show that they were capable, in their used condition, of withstanding a pressure of 4100 pounds per square inch, 5100 pounds per square inch, or 6100 pounds
 
 *955
 
 per square inch, the presence of which amount of pressure the defendant’s employees had every reason to expect to encounter and realized they would have to successfully cope with, otherwise, the well would run wild.
 

 The defendant’s representative also knew that the well was begun in January 1941 and had reached a depth of 9200 feet, the abnormally high gas pressure area, in March 1941 when the well head guaranteed by the manufacturer to withstand a pressure up to 6,000 pounds per square inch was connected to the casing. From that time until July 16, 1941 or for about two months the well was drilled to the depth of 10,534 feet without any further test of the connections being made by the defendant other than the cold water test made by itself and the Conservation Department, when the well head was installed, not exceeding 1800 pounds. It was shown that in the sixty days of operation there was wear and tear as well as considerable vibration in the drilling process, which could have affected the connection and malleable steel gasket ring because as soon as the 600 pound pressure appeared and the one inch leak occurred at the 4100 pound pressure efforts were made to tighten the bolts that held the gasket ring in position and sealed the joint.
 

 The defendant’s superintendent of production in Louisiana, who was in charge of drilling the well in question, testified that the well head, or rig, or equipment -was purchased in 1937 or 1938 and had been used but was in good repair, although he was not present when the several connections were made between the casing and the well head in March 1941. He also stated that it was the best heavy duty equipment that could be purchased at that time, 1937 or 1938. He says that this type of rig was capable of drilling a deep well up to 12,000 feet and a similar or like rig was used to drill deep wells in the1 Lake Borgne area, where gas pressure up to 2800 pounds per square inch was encountered and successfully controlled.
 

 The defendant’s evidence leaves no room for doubt that its representatives knew in advance that, if a leak occurred in any of the connections in the well head that that connection could not be taken apart and the defect repaired, because there was no method of keeping back the gas pressure being exerted thereon by gas coming through the' casing from the ,gas reservoir in- the earth. It equally demonstrates that they knew in advance that if a leak developed in any of these connections that the sand passing through the opening -would widen it by cutting a larger hole therein and in due time it would increase in size, permitting the cutting of one or more of the bolts that held the connection or joint together and ultimately resulting in the well “blowing out”.
 

 The plaintiffs’ two experts testified that where a 6100 pound pressure per square inch had been recorded on the gauge before a well previously drilled in this area had blown out, prior to perforating the casing at the depth of 10,527-29 feet they, as prudent and careful operators, would
 
 *957
 
 have had a rig or equipment installed capable of resisting a gas pressure up to 10,000 pounds per square inch, because they would know that they would encounter a like pressure or a higher pressure as indicated by the information the defendant had in its possession as to the three other wild wells in that area and from the coring of this particular well.
 

 . The defendant makes no attempt to explain the defective condition of the connection made by the malleable iron gasket between the “Studded Adapter” and the “Adapter Spool” where the leak and subsequent blow out occurred. It was not shown whether the leak was caused by improperly making the connection or a defect in the gasket ring. There is no doubt that this was a defective connection, .otherwise the blow out would not have occurred because if the connection had been properly made with properly tested parts, the defendant’s own evidence shows that it was capable of resisting a pressure up to 6,000 pounds per square inch. Although two of the three gasket rings installed in the well had been used in previous operations and had been subjected to vibration, wear and tear in drilling the well in question for a period of about two months and notwithstanding the fact that the defendant’s representatives knew at about the depth they perforated there had been previously registered and recorded a gas pressure of 6,100 pounds, they fired twenty-four shots to make the perforations in the casing without making any additional tests to see if the connections in the well head were sufficiently strong to resist the pressure they, as reasonable and prudent persons, should have anticipated and known was present. Furthermore, it appears that the perforation was made into the gas sand, which the corings had definitely and positively shown was present at that depth. This was an additional warning which reasonable and prudent persons would have heeded before making the openings or perforations which admitted the gas pressure, sand, salt water, distillate, etc., into the casing and direct contact with the connections between the casing and the well head.
 

 The defendant’s own evidence demonstrates that its agents expected excessive gas pressure because they explained that the purpose of placing the cement in the space between the outer and inner casings was to reinforce them. The casings used in this operation were hydraulicly tested and guaranteed by the manufacturer to resist a pressure of 8600 pounds per square inch. With the cement reinforcement necessarily it would have greater resistance to pressure.
 

 The defendant’s able counsel have emphasized that other operators in the Gulf area within which the tract of land in question is located used well heads guaranteed by the manufacturer to resist pressure up to 6,000 pounds per square inch and from this draw the deduction that the defendant was not guilty of negligence in using the same kind of equipment. This testimony is necessarily predicated upon a well head in perfect condition and properly connected or installed. As a chain is only as strong as its weakest link, so is a casing
 
 *959
 
 line and a well head, against which pressure is exerted, only as strong as its weakest connection or joint.
 

 The defendant relies chiefly upon the authority of McCoy et al. v. Arkansas Natural Gas Corporation, 191 La. 332, 185 So. 274, as controlling here. That case is distinguishable from the instant one in several respects: (1) The doctrine of res ipsa loquitur was not involved; (2) The gas well was successfully completed or brought in and was in a safe and normal condition. The next day vibration was observed and gradually water was forced by gas pressure through both the inside and the outside of the casing, causing a crater around the well within three days and the blowing out of the well. Unforeseeable conditions and an inexplicable phenomenon caused the trouble. Every suggestion of experts called in was employed to bring the well under control or kill it. None of them was able to state what went wrong; (3) There was no reason to anticipate excessive pressure or unusual conditions and none developed during the entire time the well was being drilled and completed; (4) The well was completed on January 30, 1928 and the best and properly tested equipment produced at that time was carefully and competently used in drilling and completing the well. Up to that date the “snubbing-in” process had not been perfected to cope with a pressure of 1125 pounds per square inch. Subsequently and before the time the witnesses testified in that case, the defendant’s expert therein stated that the "snubbing-in” method had been improved so as to be effective in controlling and killing a well where there was a high pressure. The defendant’s own evidence in this case shows that the methods of successfully handling high gas pressure have been greatly improved over those considered the best in 1928. Equipment was available in July 1941 which had a pumping capacity in excess of 7000 pounds to the square inch.
 

 After a careful consideration of the record, it is our opinion that the defendant has not borne the burden of proof of showing that it was free from negligence, particularly in the following respects: (1) That the connection where the leak and “blow out” occurred was properly made, maintained and adequately tested; (2) In failing to employ the “snubbing in” method of controlling or killing the well after it had been thoroughly demonstrated for more than a reasonable period of time that the lubricating method of controlling or killing it was ineffective, because its representatives knew that the gas pressure instead of being reduced was constantly rising; (3) In unduly and unreasonably delaying to use the Cal-Seal to control or kill the well by pumping it into the casing after it clearly and unmistakably appeared that the lubricating method was hopelessly inadequate; and (4) In not having equipment readily and immediately available to control the well. Consequently, the defendant is liable.
 

 The next issues concern the quantum.
 

 The trial judge instructed the jury that the plaintiffs bore the burden of proving by a preponderance of the evi
 
 *961
 
 dence each item of damage said to have been sustained as a result of the well “blowing out”. The petitioners claimed damages aggregating the sum of $17,-612.52. After the trial and the argument lasting seven days, the jury entered the verdict in favor of the plaintiffs, as follows: James L. Watkins — $8,755.50; Claude C. Watkins — $3,833.64; Charles M. Watkins — $3,833.64, or a total of $16,422.-78; and, in favor of the intervenor, as prayed for.
 

 From the night of July 20, 1941, when the well blew out and was uncontrollable, until August 13, 1941, when it killed itself, it was continuously erupting large volumes of salt water and sand mixed with distillate and other substances several hundred feet in the air. During about one-half of this period of time the well was on fire. The atmosphere was made to appear foggy by the spray from the well and the wind and air currents spread this moisture over an area of about six miles from the well and it settled like dew on the farm, buildings, and equipment in that section. After drying this salt and other mineral substances thus precipitated left a brownish gray sediment, which killed the rice and cotton crops as well as other vegetation and trees and corroded and rusted the metal equipment, roofing, fencing, guttering, screen wire, etc., upon which it had fallen._ The heat from the burning gas and distillate erupting from' the well dried the crops within a large area. The plaintiffs were successful rice farmers whose farm lands were located from two and a half to four miles from the well. A great deal of the salt and other mineral substances covered their fields, buildings and equipment in quantities, varying according to the direction of the wind and its velocity. It is clear that this substance seriously damaged the plaintiffs’ crops consisting of Early Prolific and Blue Rose rice and water melons, and substantially damaged the pasture lands, the metal equipment, barbwire fencing, roofing, guttering, screen wire, etc., on their farm.
 

 The controversy is really as to the extent of the damages shown.
 

 The plaintiffs’ entire rice crop for the year 1941 covered 484 acres, 100 acres of which were planted with Early Prolific and 384 acres thereof were planted with Blue Rose. Preceding the arrival of the substance from the well on the Watkins farm, the crop was in excellent condition and above the average. Since the Early Prolific rice matured sooner than the Blue Rose, the damage to it was greater and was estimated by experts to be to the extent of at least one-half thereof. The Blue Rose rice was estimated by experts to be damaged to the extent of thirty-five or forty per cent of the crop. There were no contributing causes to the loss.
 

 The identical acreage upon which the 1941 rice crop was growing (except there were four or five more acres planted in 1941) was planted with the same kinds of rice in the years 1933, 1935, 1937, 1939. The crop season for 1941 was as favorable as any of those previous years and better than the year 1939 when' there was a dry spring. The average yield on this
 
 *963
 
 property for the four years was 7,473 barrels. The yield from the same acreage in 1941 totalled 4,356 barrels, there being 3,648 barrels of Blue Rose and 708 barrels of Early Prolific. Therefore, the yield in barrels in 1941 was 3,117 barrels less than the average yield for those previous four years. As the early Prolific was estimated to be damaged 50% and the Blue Rose 35%, as a result of the “blow out” of the well, on the above outlined basis of calculation, the loss in barrels for the year 1941 was 708 of Early Prolific and 1,-964 barrels of Blue Rose. The average yield per acre during the four previous years above mentioned Was 15% barrels. In 1941, the 100 acres planted in Early Prolific averaged 7.08 barrels per acre. Considering as a basis, the average production per acre for the previous years mentioned, there was a loss of 8.42 barrels per acre or 842 barrels for the 100 acres planted in Early Prolific rice for the year 1941. The Blue Rose crop, which was less severely damaged, averaged 9.5 per acre in 1941. On the basis of the average production of 15.5 barrels per acre for the previous years stated, there was a loss of 6 barrels per acre, or a total of 2188.8 barrels for the year 1941, for the 384 acres planted in Blue Rose rice.
 

 All of the expenses' of planting the 1941 crops had been incurred prior to the “blow out”. The expenses of harvesting and marketing them were incurred subsequently thereto.
 

 With reference to the cost of harvesting the rice, the record shows that the entire crop, was generally blighted throughout by the substance that settled over the plaintiffs’ lands. The result was that the heads of the rice plants were not as full of grain as they are when the crop has not been adversely affected. As this condition obtained throughout' the entire acreage, it appears that it cost as much to harvest such a damaged crop as it did a normal one, the only difference being in the amount of the grain yielded. Therefore, there is no reason, under such circumstances, to deduct the pro rata expense of harvesting, because the plaintiffs were put to the full expense of harvesting the damaged crop.
 

 The Early Prolific rice crop from this acreage was sold on the market for $3 a barrel and the Blue Rose therefrom for $5 a barrel in the year 1941. The Early Prolific crop in question was damaged in quality to the extent of 20^ per barrel by the same substance from the well. In fine, if this rice had not been damaged in quality it would have brought $3.20 per barrel on the market at that time. From this market price or figure of $3.20 must be deducted
 
 5‡
 
 a barrel for hauling, which would have been expended if the rice had not been destroyed,
 
 1‡
 
 a barrel for insurance,
 
 6‡
 
 a barrel for commission to selling agent, and
 
 4‡
 
 a barrel for storage, or a total of
 
 16‡,
 
 leaving a net market price on this rice for the year 1941 of $3.04. The quality of the Blue Rose rice was not affected and there was no diminution in the price on that account. There must be deducted from the 1941 market price of $5 per barrel the same deductions made as to the Early Prolific, except thé
 
 *965
 
 storage for the Blue Rose rice was 9 cents instead of 4 cents a barrel, resulting in a net price for the Blue Rose of $4.79 per barrel. Figuring .on a basis of the average yield, for the previous years mentioned, it was shown that there was a total loss of 842 barrels of Early Prolific, which could have been sold on the market, less expenses, for .$3.04 per barrel or a total loss for the Early Prolific rice crop of $2,559.68. By the same method of computation, it was shown that there was a loss of six barrels per acre on the 384 tract planted in Blue Rose rice, or a total loss of 2188.8 barrels, which could have been sold at the 1941 market price, less expenses, for $4.79 per barrel, or total-ling a loss for the Blue Rose rice crop of $10,484.35, thus making the loss sustained by the plaintiffs on their 1941 rice crops the sum of $13,044.03. We might also state that the plaintiffs had borrowed $5,000 on the 1941 rice crops.
 

 The rule for computing damages to crops in terms of money was stated by the Court in the case of Williams v. Wind-ham, 3 La.App. 127, where the plaintiff claimed damages to his crops caused by the defendant’s roaming cattle, as follows:
 

 “The other case cited by defendant on this point, is that of Chicago, R. I. & P. R. Co. v. Johnson, decided by the Supreme Court of Oklahoma, and reported in 25 Okl. 760, 107 P. 662, 27 L.R.A.,N.S., 879, where the court said with reference to the method of arriving at 'the value of growing crops:
 

 “ ‘It does not appear however, that witnesses testified as to the value, such estimates being based on the average yield and market value of crops of the same kind planted and cared for in the same manner in the same community, less the cost of marketing, harvesting, and maturing, and also by stating what the crops would have brought in their matured state at a sale in that community. Such was permissible by the authorities cited from the courts of Texas, Minnesota, New York, Arkansas and Colorado, and seemed also to be in accordance with the great weight of authority.’
 

 “In the body of the opinion the court, in the last cited case, cites and quotes from the decisions of many courts showing that the method of arriving at the value of a growing crop pursued in the case at bar is the correct method. In the case at bar the crops were not matured but they had advanced to a point where but little if .any more cultivation was needed in order to mature them. The corn was in silk and tassel, the melons were formed and were of considerable size, some of the witnesses having counted them. No more expense was needed in order to mature them. Testimony was adduced showing that other crops of melons in the same community grown under similar circumstances produced certain quantities of melons and sold for certain amounts. * * * The testimony abundantly shows that the crops had a substantial value at the time they were destroyed. * * *
 

 “We think the court’s judgment in fixing the amount of damages at that figure is eminently correct, and we would have
 
 *967
 
 no hesitancy in affirming the judgment on the point.”
 

 At the time the substance settled over plaintiffs’ farm and the residence of James L. Watkins, he had four live oak or ornamental trees in the front yard. These trees were killed and had to be removed. He' asked $150 damages therefor and stated that he would not have taken $1,000 fpr them.
 

 The residence of James L. Watkins> a very substantial and attractive home, sustained damages to the roof, the guttering, the paint on the outside of the building and out houses and decorative fencing. The necessary repairs to remedy these damages required the expenditure of $250 for materials and $557 for labor, or a total of $807.
 

 James L. Watkins, one of the plaintiffs, had a two acre crop of watermelons from which he had gathered 100 melons and the remainder of the crop was completely destroyed by the substance deposited on it from the' well. • The loss was approximately 400 melons, which, at the prevailing market price of 1941, of
 
 25‡
 
 per melon, amounted to a total of $100.
 

 It was shown that the galvanized barbwire, the galvanized iron roofing and siding on the out buildings, the galvanized screen wire, the galvanized iron wind mill and the tower and tank and the tank tower were damaged by the substance from the well settling on them, causing erosion. The life expectancy of these respective items was definitely affected and the screen wire was totally destroyed.
 

 There were 172 rolls of barbwire fencing costing $4.25 per roll, with a life expectancy of 15 years under ordinary conditions. The number of rolls used in putting up the fencing and the respective number of years that these rolls of wire had been exposed to the weather was established and the computations show the total damage to the barbwire fencing was $314.85.
 

 The corrugated iron roofing and sidings on the Watkins farm at the time the “blow out” occurred was shown to consist of 167.7 squares, costing $6 per square, with a life expectancy of 30 years under ordinary conditions. Some of these squares had been exposed to the weather for a longer period of time than the others and the number of years, as well as the respective number of squares, were proved and the computations show that the loss or damage to the corrugated iron materials was $424.21.
 

 There were 74% . yards .of galvanized screen wire about two years old with a life expectancy under ordinary conditions of ten years and worth, at the time of the “blow out”, the sum of $20, not including the cost of labor to replace it. This material was a total loss.
 

 The windmill and tank and the two towers supporting them were made out of galvanized iron and originally cost $400. They were three years old at the time the damage occurred, with a life expectancy, under ordinary conditions, of 30 years. The life expectancy was reduced 50% as a result of the “blow out”. Computation based upon these figures
 
 *969
 
 showed the damage amounted to $180. These galvanized materials were owned solely by James L. Watkins, one of the plaintiffs, and the total loss thereof amounted to $938.26, based upon the foregoing figures.
 

 The three plaintiffs owned jointly the pasture of approximately 700 acres in the proportion of 50% to the father, James L. Watkins, and 25% each to his two sons. The pasture was capable of sustaining 250 head of cattle. The substance from the well practically killed all of the grass, thereby destroying the value of the land as a pasture. Pasture land rented for $1 per acre. The plaintiffs were deprived of the use of the pasture for the months of August, September, October, November and December, 1941, or five-twelfths of a year, and, computation of the damage thereon shows an amount of $291.66.
 

 The plaintiffs, the Watkins sons, Charles M. and Claude C, were the owners of the farm equipment and machinery on the Watkins’ place, consisting of: One W 30 tractor; one 22x36 tractor; one W-9 tractor; one thresher; two harrow plows; one Corsicana grader; four harrows and two binders. The evidence shows that this farm equipment and machinery sustained substantial damage as a result of the substance from the well corroding and pitting certain parts thereof. The respective replacement costs and the percentage of damage to the different parts was established and the computations of the damages therefrom show a total loss of $1,276.09.
 

 With reference to all of these respective claims, the defendant challenged the extent of the loss but did not point out any error in the method of calculation and the figures through which the totals were determined.
 

 The evidence shows that the total loss that the plaintiffs and the intervenors sustained was $16,707.64. The jury awarded the plaintiffs and the intervenors the total sum of $16,422.78. The district judge rendered judgment based upon the verdict in favor of the plaintiffs and the intervenors for the respective amounts due them according to their proportionate ownership and interest, with legal interest from judicial demand until paid.
 

 Complaint is made by the defendant as to the correctness of the ruling of the trial judge in excluding certified copies of Weather Reports of the Lake Charles Weather Station showing the daily record of the direction and velocity of the wind for the months of July, August and September, 1941. The purpose of this proposed documentary evidence was to show that the wind was not blowing in the direction of the plaintiffs’ farm during approximately half of the twenty-one days that the well was in an active state of eruption. (They were ruled out because of improper certification and on the ground that they covered only the Lake Charles area.) While it is somewhat difficult to understand these reports without any explanation thereof, even if full effect is given to them, they are not sufficient to overcome the overwhelming evidence that a substantial amount of the substance from the well was deposited over the entire Watkins’ farm causing the
 
 *971
 
 damages complained of by the plaintiffs. Furthermore, there is nothing in these reports to show any change in the direction of the wind during any one day, it being merely stated that it was blowing in an easterly, westerly, northerly or southerly direction during that particular day.
 

 It is contended that the damages to the rice crops on the Henderson estate tract of 184 acres and the 105 acre tract of the United Life & Accident Insurance Company (which were rented by their respective owners to the plaintiffs for a rental charge of one-sixth of the crops), cannot be recovered by the plaintiffs and should be deducted from the amount of the verdict and judgment. Clearly, the plaintiffs, as lessees, were liable to their lessors for the rental charges, even though the crops were partially damaged, in the event that the plaintiffs were successful in recovering in this action. The title or ownership of the crops was in the plaintiffs as lessees with the responsibility of accounting to the lessors for the one-sixth rental charge. The law does not require creditors under those circumstances to institute separate suits to recover their respective claims. The Henderson lessors did intervene and claim their share of the damages to the extent of their rent charges but the other lessor did not. The plaintiffs answered the appeal and prayed that if the judgment is amended in so far as to deny the Henderson intervenors the amount allowed them by the verdict and the judgment, that the judgment be increased so as to grant that amount to the plaintiffs. Cleárly, under the above-recited facts, the defendant is without any interest or right to complain that the plaintiffs, as owners of the crops, are not entitled to recover the full damages to the crops growing on these two respective fields, simply because they were rented on the basis of the rent charge being fixed by a certain proportion of the crop or yield.
 

 It is also said that the plaintiffs are not entitled to recover the damages to the 700 acres of pasture lands because one of the plaintiffs gratuitously permitted the herd of cattle which had been grazing thereon to be pastured on his other lands. The defendant is not entitled to be relieved thereby of the responsibility of paying the plaintiffs for the value of their property which was destroyed through the defendant’s fault. The plaintiffs are not claiming rent for other pasture lands used but the loss or damage they sustained to the particular pasture lands in question.
 

 The defendant also complains that the allowance of $4.50 for damages to a decorative metallic lamp was excessive. This electrical fixture cost $9 and the damages due to discoloration and erosion of the metal caused an estimated depreciation in its value of fifty per cent. Other than the statement that this amount is unreasonable, there is nothing to show that the lamp was not damaged to the extent shown by the plaintiffs.
 

 From what we have stated, it is apparent that it cannot be successfully urged that the amounts awarded by the verdict
 
 *973
 
 of the jury and the judgment of the district court are not justified from the evidence. Clearly, the verdict is not manifestly erroneous.
 

 For the reasons assigned, the judgment of the district court is affirmed; appellant to pay'all costs of court.